The STATE of Ohio, Appellee,

v.

SIMS, Appellant.

[Cite as *State v. Sims* (1998), 127 Ohio App.3d 603.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 16592.

Decided May 22, 1998.

*John J. Amarante,* Montgomery County Assistant Prosecuting Attorney, Appellate Division, for appellee.

*Victor A. Hodge,* for appellant.

FREDERICK N. YOUNG, Presiding Judge.

Appellant Carmen D. Sims appeals from her conviction and sentence in the Montgomery County Common Pleas Court for corrupting another with drugs in violation of R.C. 2925.02(A)(2).

During the pendency of her appeal, Sims passed away. Her counsel, Victor A. Hodge, notified us of her death, and, upon motion by the state and with the concurrence of her counsel, this court substituted Victor A. Hodge for Sims as the party on appeal. App.R. 29(A). *State v. McGettrick* (1987), 31 Ohio St.3d 138, 31 OBR 296, 509 N.E.2d 378. The matter is now properly before us and ready for decision. References to Sims in this decision denote Hodge as the party on appeal.

Sims advances four assignments of error. First, she challenges the warrantless entry by police officers into a home where she was found and detained. Next, Sims contends that the trial court erred by declaring a subsequently issued warrant supported by probable cause. Third, she argues that the trial court erred by refusing to suppress a statement she made to officers. Finally, Sims claims that the trial court's evidentiary rulings denied her the opportunity to cross-examine the state's witnesses effectively.

The present appeal stems from Sims's arrest on July 19, 1996, after police entered a home at 164 McReynolds Street in Dayton, detained the home's

occupants, secured a warrant, and searched the home, finding, among other things, drugs in Sims's purse. Prior to Sims's arrest, area law enforcement officers had received information from various sources over a three-year period identifying a Cassidy Stapleton as a drug trafficker. Additionally, on June 2, 1996, agents of the Ohio Organized Crime Investigations Commission observed Stapleton engage in an apparent drug transaction at "Dr. Doodle's" lounge with "Ginger," a barmaid.

Thereafter, around June 24, 1996, a confidential informant told police that Stapleton was engaged in drug trafficking with Earnest Washington and Carmen Sims. Police also knew that Sims resided at 8095 Mt. Hood in Huber Heights, Ohio, and that Washington frequented that address. The confidential informant told police that Stapleton had received up to one ounce of cocaine from Washington and/or Sims at 8095 Mt. Hood within the previous thirty days. In addition, officer Kirk J. Bell learned from two law enforcement agencies that Sims and Washington were involved in drug trafficking at 8095 Mt. Hood. Officer Bell also learned that a dark green 1994 Eagle was used to transport the drugs.

On July 18, 1996, officer Bell received information from an unidentified source, stating that Stapleton was about to buy cocaine from 8095 Mt. Hood. Police then conducted surveillance of Stapleton and 8095 Mt. Hood, observing Stapleton use a public phone in West Carrollton, Ohio, and within two minutes, observing the 1994 Eagle leave 8095 Mt. Hood. Subsequently, on July 19, 1996, police learned from an unidentified source that Stapleton would purchase cocaine from Sims. The officers expected the drug transaction to occur at 8095 Mt. Hood in Huber Heights and, as a result, secured a warrant for that address.

Conducting surveillance, however, police observed Stapleton leave a motel in a car driven by Jeff Maxey, a known drug dealer. Police followed the car to the Bolton Street area of Dayton. There officers observed Stapleton exit the car and meet with an unidentified male approximately one block away from 164 McReynolds Street. Police stopped Stapleton as he walked back to the car and arrested him after discovering cocaine in his possession.

After arresting and removing Stapleton, several officers approached a residence at 164 McReynolds Street with the 1994 Eagle parked "in the immediate vicinity." After reaching the house, officers waited outside for five to ten minutes. They then approached the front door and sought permission to enter and search the house. After being denied permission by Bruce Castle, the homeowner, approximately five officers entered anyway and detained several people, including Sims, in the living room. Police waited with the detained occupants while officer Bell sought a search warrant for the house. Prior to the warrant's arrival, the detained individuals were not free to leave unless they

consented to a search "to make sure that none of the evidence would leave the scene."

At one point, Jennifer Debrusk, a juvenile, consented to be searched so she could leave. The search revealed drugs in her possession. Debrusk told police she had obtained the drugs from Sims. Additionally, sometime before the warrant's arrival, Sims complained of sharp pains and difficulty breathing. As a result, police accompanied her to a local hospital and remained with her until she could be searched for contraband. After searching Sims and discovering nothing, an officer left her alone at the hospital.

While Sims remained at the hospital, officer Bell returned to 164 McReynolds Street several hours later with a search warrant. When executing the warrant, police discovered drugs in Sims's purse at 164 McReynolds. Officers subsequently arrested her at a gas station, where she was waiting for a ride home after checking herself out of the hospital.

A grand jury later indicted Sims on charges of drug trafficking, drug possession, and corrupting another with drugs. She filed a motion to suppress the evidence against her on September 27, 1996. Following a hearing, the trial court overruled Sims's motion on February 24, 1997. Sims then entered a no-contest plea to corrupting another with drugs, and the state *nolled* the drug trafficking and possession charges. Additionally, the state agreed not to oppose a minimum two-year sentence. At sentencing, however, the trial court imposed a three-year sentence but allowed Sims to remain free on bond pending her appeal. Sims then filed a timely notice of appeal advancing the following assignments of error:

"I

"The trial court erred in finding lawful the warrantless entry into 164 McReynolds and in overruling appellant's motion to suppress."

In her first assignment of error, Sims contends that the trial court erred by finding proper the officers' initial entry into the residence at 164 McReynolds Street. More specifically, Sims claims that the record does not demonstrate that the warrantless entry was necessary to prevent the destruction of drugs. Additionally, she argues that the officers could not create an "exigency" by making their presence outside the house known and then entering without a warrant.

In response, the state contends that Sims lacks standing to challenge the warrantless entry into the home. The state notes that Sims did not own the home and alleged only to have spent the previous night there as a guest. Furthermore, the state contends that Sims lacks standing to challenge the admissibility of drugs found in Jennifer Debrusk's possession. The state also

alleges that the drugs in Debrusk's possession formed the sole evidentiary basis underlying the corrupting count to which Sims entered her plea.

We cannot agree with the state's assertions. Even assuming, *arguendo*, that Sims lacks standing as an overnight guest to contest the entry, we believe that she possesses standing to challenge the officers' entry into the home because she was seized immediately upon their entry. After entering the home, Sims and the other occupants were placed in the living room and not allowed to leave unless they consented to a search for evidence.[1] In *State v. Carter* (1994), 69 Ohio St.3d 57, 63, 630 N.E.2d 355, 360, the Ohio Supreme Court reasoned that both a driver and a passenger possess standing to challenge a warrantless vehicle stop "because when the vehicle is stopped, they are equally seized, and their freedom of movement is equally affected." Additionally, in *State v. Herron* (Dec. 6, 1996), Darke App. No. 1404, unreported, 1996 WL 697021, we reasoned that a three-hour in-home detention for the sole purpose of preventing a suspect from leaving the presence of police while they obtain a search warrant amounts to a custodial detention.

Similarly, we believe that Sims and the other occupants of 164 McReynolds Street possess standing to challenge the officers' entry because they were seized for several hours until police returned with a warrant. We do, however, agree with the state's argument that Sims cannot challenge the admissibility of drugs found in Jennifer Debrusk's possession. Nevertheless, we cannot agree that Debrusk's drugs were the only evidence relevant to Sims's conviction of corrupting another with drugs. At a hearing on Sims's suppression motion, the parties' stipulated that drugs found in Sims's purse formed the basis of her indictment for drug possession. In light of this stipulation, the state suggests that the drugs found in Debrusk's possession necessarily formed the basis of Sims's indictment for corrupting another with drugs. Since Sims cannot challenge the admissibility of drugs found in Debrusk's possession, the state argues that she lacks standing to challenge her conviction of corrupting another with drugs.

We cannot agree with the state's reasoning. Although the parties agreed that drugs found in Sims's purse resulted in the possession charge, we harbor no

---

1. In its brief to this court, the state argues that no "seizure" occurred because Sims was free to leave if she agreed to be searched and, in fact, did leave for the hospital. We disagree. The officers possessed no authority to force Sims to exchange her freedom from warrantless searches for her freedom of movement. Furthermore, although the officers eventually allowed Sims to go to the hospital after she complained of health problems, an officer remained in her company until she consented to a search. Under these circumstances, we believe that Sims and the other occupants were "seized" upon the officers' entry into the home.

doubt that the state would have supported its charge of corrupting another with drugs at trial with the drugs found in Sims's purse *and* the drugs found in Debrusk's possession. Absent a stipulation in the record stating that the *only* evidence relevant to Sims's charge of corrupting another with drugs was the evidence taken from Debrusk, we decline to make such a determination on appellate review.

■ Accordingly, we proceed now to Sims's argument that the officers unlawfully entered the home at 164 McReynolds Street without a warrant. In a February 24, 1997 judgment entry, the trial court found the officers' entry permissible because they "feared the destruction of evidence while awaiting the warrant." This court's review of the record, however, fails to demonstrate that the officers possessed probable cause to believe that drugs were located in 164 McReynolds when they made the warrantless entry.

In reaching this conclusion, we find very little in the record explaining why the officers believed that drugs would be found in the home. In an affidavit for a search warrant drafted while officers waited in the home, Officer Bell averred at length about information indicating that Sims and Earnest Washington were dealing drugs out of 8095 Mt. Hood in Huber Heights. The affidavit also cited a tip from an unidentified source, stating that Cassidy Stapleton would purchase drugs from 8095 Mt. Hood. Officer Bell's affidavit does not mention the 164 McReynolds Street residence until the final paragraph. That paragraph states that police observed Stapleton and a Jeff Maxey drive to the Bolton Street area of Dayton, where Stapleton exited the car and met with a "male individual" in "the area of 164 McReynolds." The affidavit also states that police arrested Stapleton as he walked back to the car driven by Maxey. Additionally, the affidavit notes that the Eagle vehicle was parked "in the immediate vicinity" of 164 McReynolds and that the home's occupants refused to consent to a search for "specific evidence." [2]

Significantly, however, nothing in the affidavit describes illegal activity occurring inside 164 McReynolds Street. All allegations of drug activity related to 8095 Mt. Hood in Huber Heights. Furthermore, Bell's affidavit states that police arrested Stapleton "in the area of" 164 McReynolds after he met with an unidentified male. The record, however, demonstrates that the meeting occurred up to one block away from 164 McReynolds, and nothing suggests why officers believed contraband would be found in the home. Indeed, many houses were "in

---

**2.** In a final sentence, the affidavit states: "Sims made the statement that Stapleton was present with her to sell her cocaine, not to purchase it from her." We note, however, that Sims made this statement *after* police had entered the home. Consequently, we will not consider it to determine whether the officers possessed probable cause to make the warrantless entry.

the area" where police arrested Stapleton. The only piece of evidence even arguably linking 164 McReynolds to drug activity is the presence of the green Eagle outside. Without more, however, we are unprepared to say that the presence of a suspected drug vehicle "in the immediate vicinity" of an otherwise unsuspicious residence justifies a warrantless intrusion into the home.

Testimony presented at the suppression hearing further supports our conclusion that the officers improperly entered 164 McReynolds. At the hearing, Officer Bell was asked on redirect examination why police entered 164 McReynolds and detained its occupants. He responded: "That is where the course of this drug transaction took place." Subsequently, on recross-examination the following exchange occurred between defense counsel and Bell:

"Q. Detective, you just mentioned this is where—164, this is where the drug transaction went down. I don't see anything about a drug transaction taking place at 164 McReynolds Street. What drug transaction are you talking about?

"A. The transaction which Miss Sims was arrested for.

"Q. But your affidavit doesn't say anything about Miss Sims being involved in a drug transaction, does it?

"(Prosecutor Burk) Objection. That's for your Honor to decide.

"(The Court) Sustained.

"Q. Let me ask specifically: What was the—describe the drug transaction that you're saying Carmen Sims was involved in.

"(Prosecutor Burk) Objection.

"(The Court) Overruled.

"A. The sale of cocaine to Cassidy Stapleton.

"Q. Where and when?

"A. 164 McReynolds. As it says, in the immediate vicinity of 164 McReynolds on July 19th at—approximately 2:15 p.m. or so.

"Q. Doesn't your affidavit state that Stapleton met another male individual in the area of 164? It doesn't say anything about meeting Carmen Sims there, a female.

"(Prosecutor Burk) Objection

"(The Court) Sustained. Save it for your argument. It says what it says.

"Q. Where exactly did the drug transaction take place, in or out of 164 McReynolds Street?

"A. That's a tough question to answer as, of course, I was not there. It happened in the vicinity of 164 McReynolds.

"Q. And this transaction occurred between Cassidy Stapleton and Carmen Sims?

"A. Those were the two principals, yes, sir.

"Q. And you don't have any knowledge as to whether or not it occurred in or out of the house?

"A. At that time, I did not.

"Q. So you didn't know whether or not a drug transaction had occurred inside or outside of the house, but you went to request a warrant to enter the house. Is that correct?

"A. That's correct. * * *"

Through the foregoing testimony, Officer Bell explained that police entered 164 McReynolds because it was the location where Sims and Stapleton had engaged in a drug transaction. In support, he referred to his affidavit for a search warrant. As defense counsel pointed out, however, the affidavit does not describe criminal activity involving 164 McReynolds Street. To the contrary, it describes Stapleton meeting an unidentified *male* individual after exiting a car "in the area of" 164 McReynolds, which, as we noted above, is also "in the area of" other homes.

In its February 24, 1997 judgment entry overruling Sims's motion to suppress, the trial court recited as fact that "Stapleton exited the car and entered the home at 164 McReynolds at 1:30 p.m." The court then stated that Stapleton was arrested for "the cocaine purchase" as he returned to the car. We find nothing in Officer Bell's affidavit, however, stating that Stapleton entered 164 McReynolds Street and purchased drugs. "When reviewing a trial court's ruling on a motion to suppress evidence, we must accept the trial court's factual findings if they are supported by competent, credible evidence." *State v. Martin* (Nov. 14, 1997), Montgomery App. No. 16256, unreported, 1997 WL 705472. In the present case, we find no evidence supporting the trial court's determination that Stapleton purchased drugs inside 164 McReynolds from Sims or anyone else.

■ Furthermore, we agree with Sims's assertion that the record is devoid of evidence suggesting that the home's occupants were aware of the police presence outside. Sims is correct in her contention that police cannot create an exigency by announcing their presence and then entering a home to prevent the destruction of drugs. *State v. Jenkins* (1995), 104 Ohio App.3d 265, 661 N.E.2d 806. Accordingly, we agree that the officers improperly entered the home without a warrant, and we sustain Sims's first assignment of error.

"II

"The trial court erred in finding that the search warrant issued on probable cause and in overruling appellant's motion to suppress."

In her second assignment of error, Sims contends the trial court erred by finding that the search warrant for 164 McReynolds was issued on probable cause. In opposition, the state argues that Sims lacks standing to challenge the warrant and, in any event, that the warrant was supported by probable cause.

■ Once again, even assuming that Sims lacks standing to challenge the warrant on the basis of her overnight-guest status, an issue the parties dispute, we find standing for two reasons: (1) the warrant specifically identified Sims as one of the individuals to be searched, and (2) the officers' search included Sims's purse, an item in which she possessed a privacy interest.

■■ Furthermore, for largely the same reasons stated above, we agree that Officer Bell's affidavit did not establish probable cause to search Sims or the residence at 164 McReynolds Street. Other than Sims's statement, made after police unlawfully entered 164 McReynolds, the affidavit contained little information about 164 McReynolds and related drug activity. The first paragraph simply recited Bell's qualifications. Paragraphs 2 through 8 recited information linking Sims, Washington, and Stapleton to drug activity and also linked the activity to 8095 Mt. Hood in Huber Heights. Only paragraph 9 even mentioned 164 McReynolds, noting that Stapleton had exited a car and met an unidentified male "in the area of 164 McReynolds." The affidavit also noted that a green Eagle was parked "in the immediate vicinity" of 164 McReynolds. In *Martin, supra,* this court recognized its duty to conduct a *de novo* review of a trial court's probable cause determination. *Martin, supra,* citing *Ornelas v. United States* (1996), 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911. After conducting such a review, we cannot agree that Officer Bell's affidavit established probable cause justifying the search warrant's issuance.

■ Furthermore, we find the "good faith" exception to the warrant requirement inapplicable. The officers sought the warrant only after first unlawfully entering 164 McReynolds. In addition, Officer Bell's warrant affidavit included information police learned only after entering the residence. The affidavit included a statement that Sims allegedly made after police entered the home. It also noted Sims's presence inside the residence and, consequently, named her as one of the people to be searched. We note too the issuing magistrate's inability to recall Officer Bell's telling him that police already were inside 164 McReynolds when the magistrate signed the search warrant. The magistrate testified that it was not possible that Bell told him police were inside because "I'm an old criminal defense lawyer, and I think I would have made a note of that." The magistrate

also testified that he would have been "disinclined" to issue the warrant if he had known that police were inside the home.[3] Under these circumstances, we cannot say that the officers acted in "good faith" when procuring the warrant. As a result, we sustain Sims's second assignment of error.

"III

"The trial court erred in refusing to suppress appellant's statements."

In her third assignment of error, Sims first contends that the trial court should have suppressed a statement she made after the officers' warrantless entry into 164 McReynolds. In support, she argues (1) that she was in custody and (2) that the officers failed to recite her *Miranda* rights. Based upon the record before us, however, we cannot determine whether Sims made her statement in response to custodial interrogation or whether she offered it gratuitously. Consequently, we cannot determine whether the statement was suppressible under the Fifth Amendment based upon the officers' failure to provide *Miranda* warnings.

Regardless of whether Sims's statement was voluntary or the product of custodial interrogation, however, she made her statement *after* the officers unlawfully had entered the home. This fact implicates the Fourth Amendment and its exclusionary rule, which prohibits the state's use of evidence resulting from unreasonable searches and seizures. As the United States Supreme Court recognized in *Brown v. Illinois* (1975), 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416, the Fourth and Fifth Amendments involve different interests and serve different policies. See, also, *State v. Maurer* (1984), 15 Ohio St.3d 239, 256, 15 OBR 379, 393, 473 N.E.2d 768, 785 (noting that "*Miranda* concerns the Fifth and Sixth Amendment guarantees. The Fourth Amendment concerns illegal arrests, and the fruits therefrom."). Even if Sims's statement is found voluntary under the Fifth Amendment, certain Fourth Amendment concerns still remain. *Brown, supra,* at 601–602, 95 S.Ct. at 2260–2261, 45 L.Ed.2d at 425–426.

Incriminating statements stemming from unreasonable searches and seizures, however, need not always be suppressed as " 'fruit of the poisonous tree.' " *Id.,* 422 U.S. at 599, 95 S.Ct. at 2259, 45 L.Ed.2d at 424, quoting *Wong Sun v. United States* (1963), 371 U.S. 471, 487–488, 83 S.Ct. 407, 417–418, 9

---

3. On cross-examination by the state, the magistrate later agreed that he would not have been troubled by the officers' entry into the home if he had known "that the entry and detention were reasonable and necessary to avoid the destruction of evidence." As we explained in our analysis of Sims's first assignment of error, however, the record does not support these assumptions. The record fails to demonstrate that the officers possessed probable cause to believe that drugs would be found inside 164 McReynolds. Furthermore, as we explained above, no exigent circumstances existed because the record is devoid of evidence showing that the home's occupants were aware of the officers' presence in the neighborhood.

L.Ed.2d 441, 455–456. As the *Brown* court noted, "It is entirely possible, of course, as the State here argues, that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality." *Id.,* 422 U.S. at 603, 95 S.Ct. at 2261, 45 L.Ed.2d at 427. The court then reasoned, however, that "*Miranda* warnings, alone and *per se,* cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited." *Id.*

Rather, the admissibility of an incriminating statement made after an unlawful seizure depends upon several factors. As the *Brown* court explained:

" * * * The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct are too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances * * * and particularly the purpose and flagrancy of the official misconduct are all relevant. * * * The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution." See, also, *State v. Davis* (Jan. 31, 1994), Brown App. No. CA93–06–007, unreported, 1994 WL 29884, citing *Brown.*

In the present case, the trial court's judgment entry overruling Sims's suppression motion did not address the Fourth or Fifth Amendment issues raised by her statement. Rather, the court erroneously concluded that Sims made no incriminating statements after police entered the home. Paragraph 9 of officer Bell's affidavit for a search warrant, however, contains an incriminating statement Sims allegedly made after officers entered the home.

Based upon our own review of the record, we find little information in the suppression hearing transcript concerning the circumstances of Sims's statement. As a result, we cannot determine (1) whether the statement was gratuitous and unsolicited by police, (2) whether it was the product of questioning and, if so, whether *Miranda* warnings were given, and (3) even if voluntary, whether the statement was sufficiently an act of free will to purge the taint of the Fourth Amendment violation in accordance with *Brown, supra.*

Furthermore, we note that the admissibility of Sims's statement is not moot. As we explained above, the trial court erred by not suppressing the drugs found

in Sims's purse. Given our finding that Sims lacks standing to challenge the evidence obtained from Jennifer Debrusk, however, the state still may decide to pursue a charge against Sims based on that evidence, and her statement to police would be relevant. Consequently, we must remand this cause for the trial court to answer the questions we identified in the preceding paragraph and to determine whether the admission of Sims's statement would violate either the Fourth or Fifth Amendments.

In this assignment of error, Sims also argues that the trial court erred by refusing to suppress statements she made at the police station after her arrest. The record reveals that police formally arrested Sims after discovering drugs in her purse. She was taken to the Montgomery County Jail, where she spoke with police and consented to a search of her Huber Heights home. The trial court's judgment entry does not specifically address Sims's *Mirandized* statements at the police station or her consent to a search of her Huber Heights home. In her brief to this court, Sims contends that the trial court should have suppressed the statements and any evidence obtained from the search as fruit of the poisonous tree. For the same reasons we identified above, however, the trial court must determine upon remand whether Sims's postarrest statements and consent to search were sufficiently acts of free will to purge the taint of the Fourth Amendment violation.

"IV

"The trial court erred in denying appellant her constitutional right to confrontation."

 In her final assignment of error, Sims contends that the trial court erred by limiting defense counsel's ability to cross-examine Officer Bell regarding the contents of his warrant affidavit. In response, the state argues that the trial court properly sustained its objections to defense counsel's questions.

Sims's assignment of error focuses upon the following questions from defense counsel to Officer Bell, objections by the state, and evidentiary rulings by the trial court:

"Q. Now, at the time your officers entered the premises, your understanding is that's when they first encountered Carmen Sims?

"A. Yes, that's my understanding.

"Q. Why was she detained at that point in time if there was no warrant for her, was there?

"A. No, sir, there was no arrest warrant for her.

"Q. And from what I see in the affidavit, you didn't witness any criminal act alleged in the affidavit by her.

"(Prosecutor Burk) I object to that. I think that was up for a judge to decide.

"(The Court) Sustain the objection. Go ahead.

"* * *

"Q. The affidavit reflects a meeting that Mr. Stapleton had. It doesn't reflect anything about what Carmen Sims did. Is that correct?

"(Prosecutor Burk) Objection, again, your Honor. I think that's for your Honor to decide when you review the affidavit.

"(The Court) Sustain the objection. I tend to agree with you.

"* * *

"Q. Detective, you just mentioned this is where—164, this is where the drug transaction went down. I don't see anything about a drug transaction taking place at 164 McReynolds Street. What drug transaction are you talking about?

"A. The drug transaction which Miss Sims was arrested for.

"Q. But your affidavit doesn't say anything about Miss Sims being involved in a drug transaction, does it?

"(Prosecutor Burk) Objection. That' for your Honor to decide.

"(The Court) Sustained.

"Q. Let me ask specifically: What was the—describe the drug transaction that you're saying Carmen Sims was involved in.

"(Prosecutor Burk) Objection.

"(The Court) Overruled.

"A. The sale of cocaine to Cassidy Stapleton.

"Q. Where and when?

"A. 164 McReynolds. As it says, in the immediate vicinity of 164 McReynolds on July 19th at—approximately 2:15 p.m. or so.

"Q. Doesn't your affidavit state that Stapleton met another male individual in the area of 164? It doesn't say anything about meeting Carmen Sims there, a female.

"(Prosecutor Burk) Objection.

"(The Court) Sustained. Save it for your argument. It says what it says."

In its brief to this court, the state insists that the trial court properly sustained its objections. In support, the state relies upon Evid.R. 1002, the "best evidence" rule. This rule states that to prove the contents of a writing, a party must

produce the original writing. In the present case, however, defense counsel did not attempt to establish the contents of Officer Bell's affidavit. To the contrary, defense counsel's questions focused upon what the affidavit *did not* say. In our view, the questions constituted a legitimate effort to cross-examine Officer Bell regarding his testimony that Sims engaged in a drug transaction with Stapleton. Nothing in Evid.R. 1002 made the questions improper simply because they referred to Officer Bell's affidavit.

Accordingly, we sustain Sims's fourth assignment of error, and we reverse the trial court's judgment in part. As we noted above, Sims lacks standing to object to the admissibility of evidence obtained during the officers' search of Jennifer Debrusk. Consequently, the trial court properly overruled Sims's motion to the extent it sought suppression of that evidence. The trial court erred, however, by failing to suppress the drugs found in Sims's purse. Accordingly, we reverse the trial court's judgment to the extent it found the drugs admissible. Finally, we must remand this cause for the trial court to determine (1) whether the admission of Sims's statement inside the house violates either the Fourth or Fifth Amendment and (2) whether Sims's subsequent *Mirandized* statements and consent to have her Huber Heights home searched were sufficiently acts of free will to purge the taint of the officers' earlier Fourth Amendment violation.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

FAIN and GRADY, JJ., concur.