The STATE of Ohio,

v.

WINSTON.

2010-Ohio-5723.]

Court of Common Pleas of Ohio,
Clermont County.

Decided Sept. 30, 2010.

Don White, Clermont County Prosecuting Attorney, and Kevin Miles, Assistant Prosecuting Attorney, for the state of Ohio.

W. Stephen Haynes, Assistant Public Defender, for defendant.

McBRIDE, Judge.

{¶ 1} This cause is before the court for consideration of a motion to suppress filed by the defendant, Levi Winston.

{¶ 2} The court scheduled and held hearings on the defendant's motion to suppress on June 11 and June 15. At the conclusion of the second hearing, the court took the issues raised by the motion under advisement. After a subsequent discussion with counsel in chambers, the court allowed the defense to supplement its prior motion because no evidence regarding the seizure of marijuana plants outside the home was elicited during the June 11 and June 15 hearings. The court scheduled and held a continuation of the motion hearing on August 24, 2010, and at the conclusion of that hearing, the court again took the issues raised by the motion under advisement.

{¶ 3} Upon consideration of the motion, the record of the proceeding, the evidence presented for the court's consideration, the oral and written arguments of counsel, and the applicable law, the court now renders this decision.

## I. FINDINGS OF FACT

### A. THE JUNE 11 AND JUNE 15 HEARINGS

{¶ 4} On August 13, 2009, Agent John Pryor of the Miami Township Police Department and Clermont County Narcotics Unit was notified of an anonymous tip that marijuana was being grown outside the residence on the property located at 6480 Springhouse Avenue, in Clermont County, Ohio. Pryor arrived at the Springhouse Avenue address and observed, from a location on an adjoining property and the common driveway of the property, marijuana plants growing on the property.

{¶ 5} Pryor approached the front door of the residence with another officer and knocked on the door. The defendant, Levi Winston, answered the door, and Pryor, after identifying himself as a narcotics officer, asked Winston about the marijuana plants growing on the property. Winston replied that the plants grew wild. Pryor testified that at that point, it was his intent to search the residence, either by consent or by obtaining a search warrant.

{¶ 6} Pryor asked Winston if he was the owner of the residence, and Winston replied that he was not but that he could get the owner on the telephone. Winston, who had been standing in the doorway during this encounter, went back inside the house and told the officer that he was going to get the phone and that he would be right back. As Winston turned to go inside, Pryor placed his hand on the front door, preventing Winston from closing it. The defendant asked Pryor to wait there; however, Pryor and another officer entered the house despite not being invited into the home, and Pryor explained to the defendant that he could not let him out of his sight.

{¶ 7} Shortly after the agents entered the home, the defendant retrieved the telephone and sat on the stairs in the house while Pryor spoke to Stephanie Back, the lessee of the residence, on the phone. Pryor explained the consent-to-search form to Back over the telephone in the defendant's presence, and Back agreed to allow the search.

{¶ 8} After completing his telephone conversation with Back, Pryor explained to Winston that he could either sign the consent form to allow a search of his room and belongings or that Pryor would wait in the home while he attempted to obtain a warrant. Winston agreed to allow a search of his room and signed a form memorializing his consent.

{¶ 9} After obtaining the consent to search from Winston, Pryor directed Winston to sit in the kitchen, where other agents were located, and a search of the entire residence was performed. Winston remained there throughout the entirety of the search, which lasted approximately one hour. Winston did not feel that he was free to leave and did not feel as if he had any choice but to remain in the kitchen. While the defendant was never placed under arrest or in handcuffs on the date in question, Pryor testified that for safety reasons, he would not have allowed the defendant to leave the premises and that he required that the defendant be in his presence or the presence of other officers at all times while officers were on the premises.

{¶ 10} As a result of the search, the officers discovered (1) $2,165, (2) a baggie containing marijuana stems in a safe in the defendant's room, along with some of the money discovered, and (3) a scale, baggies, and approximately 14 grams of marijuana in Back's room. After the search was completed, Pryor questioned Winston about the contraband found inside the home and the defendant told

Pryor that all of the contraband found in the residence belonged to him. At no time on the day in question was Winston read his *Miranda* rights.

## B.  THE AUGUST 24 HEARING

{¶ 11} At the August 24 hearing on the motion, which was the third scheduled day for the hearing, Pryor testified that he had spoken with the defendant for approximately 30 minutes total. Pryor stated that his questioning took place in the kitchen, living room, and bedroom, and that the admission by the defendant to possessing the contraband occurred in the living room. However, the court does not find this testimony to be credible, as Pryor's memory of the facts that occurred on the day in question was hazy and uncertain at best and there was no mention of the questioning moving from room to room during the first two hearing days.

{¶ 12} Pryor also could not recall whether the admission was in response to a question. He could recall only that after the defendant admitted to possessing the contraband, Pryor asked, "Including the plants?" and the defendant responded, "Yeah, including the plants."

{¶ 13} Pryor's testimony at the August 24 hearing was contradictory in several respects to his testimony at the June 11 and June 15 hearings. For instance, at the August 24 hearing, Pryor stated that he might have let the defendant leave had certain circumstances occurred. However, the court finds that this statement lacks any credibility. In this regard, Pryor was clear in his prior testimony that he would not let the defendant out of his sight once he identified himself and that he would not have let him leave the premises. Such contradictory answers reflect poorly on the general credibility of any of the testimony given by Pryor at the three hearings, especially considering the fact that Pryor could not recall many of the details of the day in question.

{¶ 14} Regardless, the court does find Pryor's testimony regarding the location of the marijuana plants outside the home to be credible, particularly because he was never asked about their location during the first two hearings and, as a result, this testimony was not contradictory to any of his initial testimony. The marijuana plants were located at the corner of the residence, just off the patio area, less than 25 feet from the house, next to a flower bed. This patio area was approximately 30 feet from the fence surrounding the yard.

## II.  LEGAL ANALYSIS

### A.  WARRANTLESS ENTRY

{¶ 15} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution protect individuals against unrea-

sonable governmental searches and seizures." [1] "The United States Supreme Court has made clear that 'in terms that apply equally to seizures of property and seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.' " [2] "The 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,' and, as a result, a warrantless entry into a residence by the police is considered presumptively unreasonable." [3]

█ {¶ 16} "The United States Supreme Court has identified four situations which form the appropriate standard for determining the existence of exigent circumstances; (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent escape, and (4) the risk of danger to police or others." [4] There is a heavy burden on the state to overcome the presumption by demonstrating that the entry fell within one of the well-recognized exceptions to the warrant requirement.[5]

{¶ 17} As noted above in its findings of fact, this court, after reviewing all the testimony before it, has determined that the defendant did not invite Pryor or any of the officers into the residence; instead, the court finds that Pryor did not allow the defendant to close the front door, and he followed the defendant into the residence without permission.

█ {¶ 18} In Pryor's testimony, the only justification provided by him for this entry is that generally once he identifies himself and the purpose of his presence to a suspect, he cannot let the suspect out of his sight for officer-safety reasons. However, there was no testimony and no suggestion that the defendant posed or demonstrated any real threat to the safety of the officers on the property, other than the most bare and general of assertions that would be applied to any and all suspects. The risk-of-danger exception does not apply to an officer's subjective general belief but instead the risk of danger must be based on objective facts or

1. *State v. Boland*, 12th Dist. Nos. CA2007–01–016 and CA2007–01–017, 2008-Ohio-353, 2008 WL 282156, ¶ 11.

2. *State v. Frye*, 11th Dist. No. 2007–A–0023, 2007-Ohio-6941, 2007 WL 4485730, ¶ 24, quoting *Payton v. New York* (1980), 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639.

3. *State v. Lawson*, 12th Dist. No. CA2009–08–020, 2010-Ohio-1103, 2010 WL 1019419, ¶ 8, quoting *Middletown v. Flinchum* (2002), 95 Ohio St.3d 43, 44, 765 N.E.2d 330; *State v. Hopkins*, 12th Dist. No. CA2004–03–065, 2005-Ohio-2109, 2005 WL 1009804, ¶ 9, citing *State v. Nields* (2001), 93 Ohio St.3d 6, 15, 752 N.E.2d 859.

4. *State v. Wallace*, 5th Dist. No. 2004–AP–08–0064, 2005-Ohio-4500, 2005 WL 2077798, ¶ 20, citing *Welsh v. Wisconsin* (1984), 466 U.S. 740, 749, 104 S.Ct. 2091, 80 L.Ed.2d 732.

5. *Hopkins* at ¶ 9, citing *Katz v. United States* (1967), 389 U.S. 347, 367, 88 S.Ct. 507, 19 L.Ed.2d 576. See also *State v. Wilson*, 12th Dist. No. CA2006–03–008, 2007-Ohio-353, 2007 WL 210367, ¶ 19, quoting *Welsh*, 466 U.S. at 749–750, 104 S.Ct. 2091, 80 L.Ed.2d 732.

direct observations regarding the actions or proclivities of the specific suspect.[6] "There must be some real, immediate and serious consequence, if the officer postponed action in order to get a warrant for the risk of danger exception to apply." [7]

{¶ 19} In the case at bar, there is no testimony to indicate that there were any circumstances that would have led Pryor to believe that the defendant posed a threat to any officer's safety. Thus, there was no true risk of danger to the officer's safety in the present case that would warrant the entry into the defendant's home under the exigent circumstances risk-of-danger exception.

{¶ 20} Furthermore, it is important to note that "where the claimed exigent circumstances are of the officer's own making, warrantless entries and searches of a home cannot be justified." [8] The justification given for the warrantless entry was that once Pryor knocked on the door and identified himself to the defendant, the defendant would then theoretically pose a risk to officers' safety. However, this is an example of an officer making his own exigent circumstances, because there would be no exigency absent the officer's knock and announce, although this court has already found that no such exigency actually existed in the present case.

{¶ 21} While Pryor did not attempt to justify the warrantless entry based on the potential destruction of evidence, this court notes that the same analysis would apply to that reasoning. The police cannot create an exigency by announcing their presence and then entering a home to prevent the destruction of drugs.[9] When the state attempts to justify a warrantless entry based on the imminent-destruction or concealment-of-evidence exception, the existence of evidence on a premises does not in and of itself create an emergency, even when probable cause exists to believe it is there.[10] Instead, "[t]here must be some actual need to protect the evidence, demonstrated for example by overt efforts of

---

6. *State v. Williams,* 8th Dist. No. 76879, 2000 WL 426562, *5, citing *Richards v. Wisconsin* (1997), 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615; and *State v. Valentine* (1991), 74 Ohio App.3d 110, 598 N.E.2d 82.

7. Id., quoting *Minnesota v. Olson* (1990), 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85.

8. *State v. Mims,* 6th Dist. No. OT–05–030, 2006-Ohio-862, 2006 WL 456766, ¶ 25, citing *State v. Jenkins* (1995), 104 Ohio App.3d 265, 661 N.E.2d 806.

9. *State v. Sims* (1998), 127 Ohio App.3d 603, 713 N.E.2d 513, citing *Jenkins.*

10. *State v. Holloway,* 2d Dist. No. 04CA0070, 2006-Ohio-4797, 2006 WL 2640274, ¶ 19, citing *Agnello v. United States* (1925), 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145.

persons inside that, if left undisturbed, portend destruction or concealment of the evidence." [11]

{¶ 22} It should be noted that there is case law to suggest that police may reasonably detain a person pending the arrival of a search warrant when police have received probable cause of criminal activity, are in the process of securing a warrant, and fear that evidence will be lost or destroyed in the interim.[12] However, in the case at bar, there is no evidence that the officers attempted to obtain a warrant at any time, and as a result, this case law is inapplicable to the facts of the present case.

{¶ 23} Therefore, the court finds that the facts at issue in the case at bar do not support a finding that any exigent circumstances existed that would support the officers' uninvited, warrantless entry into the residence on the date in question.

■ {¶ 24} An entry conducted with the consent of one who has common authority over the premises is a well-established exception to the warrant requirement. However, while Pryor testified that the lessee of the residence gave him permission to search the residence, which will be discussed below, there was no discussion of that lessee giving permission to enter the residence, likely because Pryor never specifically requested such permission, since he had already gained entry into the home. This court is not willing to assume that Stephanie Back specifically granted Pryor permission to enter the residence, since Pryor had difficulty remembering the specifics of their conversation and it is possible, if not likely, that she was not specifically asked for permission to enter the premises and might have even been told that the officers had already entered the home.

{¶ 25} Therefore, the court finds that the warrantless entry into the residence violated the Fourth Amendment and Section 14, Article I of the Ohio Constitution.

## B.   WARRANTLESS SEARCH

■ {¶ 26} "One of the established exceptions to the warrant requirement is a search that is conducted pursuant to voluntary consent." [13] "The voluntariness of consent is a question of fact to be determined from the totality of the circum-

---

**11.** Id.

**12.** See, e.g., *State v. Wagner* (July 27, 1994), 9th Dist. No. 93CA005660, 1994 WL 395619, *2; and *State v. Torres,* 3d Dist. No. 13–04–41, 2005-Ohio-674, 2005 WL 405715, ¶ 16.

**13.** *State v. Crenshaw,* 8th Dist. No. 90635, 2008-Ohio-4859, 2008 WL 4356104, ¶ 24, citing *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854.

stances, with the government having the burden of showing by 'clear and positive' evidence that the consent was 'freely and voluntarily' given." [14]

{¶ 27} At least two Ohio appellate courts have held that an unlawful, warrantless entry into a defendant's home may taint an otherwise voluntary consent to search obtained thereafter.[15] Those courts state that "[w]hen a consent to search is obtained after an illegal entry, the consent is invalid unless the taint of the initial entry dissipated before the consent was given." [16]

{¶ 28} Due to the fact that this court's appellate district has not directly cited the language quoted above regarding consent being "tainted" after an illegal entry, this court will not analyze this matter under that standard. However, the fact that the defendant's consent was obtained shortly after law-enforcement officers illegally gained entry into his residence is one factor in the totality of the circumstances that should be considered when determining whether the defendant's consent to search was freely and voluntarily given.

{¶ 29} In the case at bar, Pryor testified that the defendant was cooperative throughout their encounter. Meanwhile, the defendant stated during his testimony that he signed the consent form to allow a search of his room because he felt like he had no real choice in the matter and he felt intimidated and "bullied" since the officers had already entered the residence despite being asked not to do so.

{¶ 30} However, the defendant was not told to consent to the search; instead, he was told he could consent to the search of his room or that Pryor would attempt to obtain a search warrant. The defendant was asked to consent to the search, and he was given a written form that required his affirmative act of signing in order for consent to be given. The defendant was asked whether he wished to sign the form and give his consent. He could have made the choice to deny consent and require the officers to attempt to obtain a search warrant, which may or may not have been issued by a judge or magistrate. There is no evidence that any of the agents told the defendant that he had to consent or that they pressured or coerced him in any way, and the court does not find that the illegal entry into the defendant's home nullified the choice presented to him to either consent to the search or to wait while the officers attempted to obtain a warrant. The defendant made the free and voluntary choice to grant his consent

---

14. Id., citing *State v. Posey* (1988), 40 Ohio St.3d 420, 427, 534 N.E.2d 61.

15. *State v. Rivera,* 8th Dist. No. 86691, 2006-Ohio-2460, 2006 WL 1351660, ¶ 10, citing *State v. Cooper,* 2d Dist. No. 20845, 2005-Ohio-5781, 2005 WL 2851649.

16. Id., citing *Cooper* at ¶ 20, citing *United States v. Buchanan* (C.A.6, 1990), 904 F.2d 349, 355–356.

to search his room and the court does not find that the illegal entry tainted his consent to the extent that it nullified its voluntary nature.

{¶ 31} The court finds that the state has met its burden in proving that the defendant's consent was freely and voluntarily given under the totality of the circumstances.

{¶ 32} Additionally, consent to search the home was also obtained from Stephanie Back, the lessee of the residence in question. There is no evidence to contradict Pryor's testimony that Back gave her consent to search the home after Pryor explained the legal implications of the consent to her, and the court finds Pryor's testimony on this issue to be credible. This court finds no reason, based on the evidence before it, to believe that Back's consent was anything less than voluntarily and freely given based on the totality of the circumstances. Therefore, there is no basis to suppress the evidence obtained from Back's room.

{¶ 33} Based on the above analysis, the search of the defendant's bedroom was done with his free and voluntary consent. As a result, the money and baggie containing marijuana stems obtained from the defendant's personal bedroom are not suppressed. Additionally, the scale, baggies, and approximately 14 grams of marijuana obtained from Back's room are not suppressed.

## C. SEIZURE OF THE PLANTS OUTSIDE THE HOME

{¶ 34} The court notes first that Pryor's viewing the marijuana plants did not amount to a "search" for Fourth Amendment purposes. Pryor was able to view the plants from an adjoining property and from the common driveway of the property.

{¶ 35} "When the police enter private property to conduct an investigation and they restrict their movement to places where the public is expressly or implicitly invited, they have not infringed upon any Fourth Amendment protection."[17] "In other words, home owners normally have a limited expectation of privacy in their driveway, sidewalk, doorstep, or other normal routes of access to the home."[18] "Even in the home and areas surrounding it, the Fourth Amendment does not protect what one readily exposes to the open view of others, regardless of where that exposure takes place."[19]

---

17. *State v. Bradford*, 4th Dist. No. 09CA880, 2010-Ohio-1784, 2010 WL 1632318, ¶ 36, citing *State v. Hart* (Dec. 23, 1997), 4th Dist. No. 97CA18, 1997 WL 800898, *2.

18. Id.

19. Id.

{¶ 36} "Even if property is within the curtilage, a visual inspection of that property from outside the curtilage does not constitute a search."[20] For instance, in the case of *United States v. Hatfield* (C.A.10, 2003), 333 F.3d 1189, an officer standing on a paved parking pad next to a house who was able to observe marijuana growing in the yard was found to not have performed a "search" under the Fourth Amendment.[21]

{¶ 37} The marijuana plants in the back yard of the property in question were readily exposed to the open view of others standing in the common driveway of the property. Merely looking from the driveway of a property, which is inherently understood to be open to the public, does not amount to a search for Fourth Amendment purposes.[22]

{¶ 38} This does not end the analysis, however, because the marijuana plants in question were part of the curtilage of the home. "[T]he state is prohibited from making unreasonable intrusions into areas where people have legitimate expectations of privacy without a search warrant," and this includes a person's home and the curtilage surrounding it.[23] " 'At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.' "[24] "Therefore, curtilage has been considered part of the home itself for Fourth Amendment purposes and courts have extended Fourth Amendment protection to the curtilage."[25] The following four-factor test is used to determine the extent of the curtilage: " 'the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.' "[26]

20. *State v. Peterson*, 173 Ohio App.3d 575, 2007-Ohio-5667, 879 N.E.2d 806, ¶ 15.

21. *United States v. Hatfield* (C.A.10, 2003), 333 F.3d 1189, 1194–1195.

22. See, e.g., *State v. Woljevach*, 160 Ohio App.3d 757, 2005-Ohio-2085, 828 N.E.2d 1015, ¶ 29 (Walkways, driveways, or access routes leading to a residence are areas of the curtilage immediately open to the public and, as a result, an officer is permitted to go upon such areas); and *State v. York* (1997), 122 Ohio App.3d 226, 233, 701 N.E.2d 463.

23. *State v. Vondenhuevel*, 3d Dist. No. 8–04–15, 2004-Ohio-5348, 2004 WL 2260102, ¶ 10.

24. Id., quoting *Oliver v. United States* (1984), 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214. See also *Woljevach* at ¶ 25.

25. Id., citing *Oliver* at 180, 104 S.Ct. 1735, 80 L.Ed.2d 214.

26. Id. at ¶ 11, quoting *United States v. Dunn* (1987), 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326.

{¶ 39} The area in question in the case at bar is immediately adjacent to the patio of the house and is next to a flower bed. The area is included in the back yard of the home and is enclosed by a fence and is approximately 25 feet from the house. Applying the factors to the facts of the case at bar, the court finds that the marijuana plants were included within the curtilage of the home.

{¶ 40} In *State v. Vondenhuevel*, 3d Dist. No. 8–04–15, 2004-Ohio-5348, 2004 WL 2260102, the court found that a warrantless seizure of plants located within the curtilage of a home was not permissible based solely on the fact that the plants were in plain view, absent exigent circumstances.[27] In *State v. Mims*, 6th Dist. No. OT–05–030, 2006-Ohio-862, 2006 WL 456766, the court likewise noted that "[t]he plain view exception to the warrant requirement, however, only creates probable cause to support a warrant—it does not and cannot create justification to enter a home or property without a warrant."[28] Therefore, the officer who could view marijuana plants in the defendant's back yard could not justify the warrantless seizure of those plants simply because the plants were in plain view.[29]

{¶ 41} However, while this court has concluded that there were no exigent circumstances present in the case at bar, the court has also found that both the defendant and the owner of the home gave their knowing and voluntary consent for the home to be searched. As a result, by virtue of this consent, the officers were lawfully permitted to be on the property and seize any contraband found thereon.[30] Due to the fact that the curtilage of the home is protected by the Fourth Amendment because it is understood to be an extension of one's house and the privacy expected to be enjoyed therein,[31] it stands to reason that the

---

27. Id. at ¶ 15–20.

28. *Mims* at ¶ 21.

29. Id.

30. See, e.g., *State v. Wilson*, 12th Dist. No. CA2006–03–008, 2007-Ohio-353, 2007 WL 210367, ¶ 34, citing *Horton v. California* (1990), 496 U.S. 128, 136–137, 110 S.Ct. 2301, 110 L.Ed.2d 112; and *State v. Landis*, 12th Dist. No. CA2005–10–048, 2006-Ohio-3538, 2006 WL 1880495 (plain-view exception authorizes seizure of illegal objects or contraband, regardless of the existence of a warrant, if the initial intrusion leading to the discovery was lawful, item was in plain view, and the incriminating or illegal nature of the items was immediately apparent). See also *State v. Sutton*, 7th Dist. No. 01–CA–181, 2002-Ohio-6901, 2002 WL 31813086, ¶ 20 ("Under the plain view doctrine, if law enforcement officers are where they have a legal right to be, they may seize evidence which is contraband and in plain view"), citing *Arizona v. Hicks* (1987), 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347.

31. See, e.g., *State v. Staton* (Mar. 15, 1991), 2d Dist. No. 90–CA–62, 1991 WL 35224, *3; and *Vondenhuevel* at ¶ 10 (The curtilage is considered part of the home for Fourth Amendment purposes).

consent to search one's home extends to the cartilage, and, therefore, any contraband in the curtilage may be lawfully seized pursuant to the consent search.[32]

{¶ 42} As a result, the marijuana plants located outside the home were lawfully seized.

## D.  CUSTODIAL INTERROGATION

{¶ 43} The final element of the defendant's motion to suppress seeks to exclude any and all statements the defendant made to law enforcement while he was not free to leave the house.  The only statement that was explicitly referred to during the testimony was the defendant's statement indicating that all the contraband inside the home belonged to him.

{¶ 44} "The 'prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' "[33]  "It is well-established that *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him in custody."[34]

{¶ 45} "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.' "[35]  " 'Under this standard, a suspect obviously is in custody if he is formally placed under arrest prior to interrogation.  Where the suspect has not been formally arrested, the restraint on the suspect's freedom of movement must be significant in order to constitute custody.' "[36]

{¶ 46} The initial determination whether a person is in custody, for purposes of *Miranda,* depends on the objective circumstances of the interroga-

---

32.  See *Wilson,* supra; and *Sutton,* supra.

33.  *State v. Coleman* (Apr. 29, 2002), 12th Dist. No. CA2001–10–241, 2002 WL 745322, *3, quoting *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694.

34.  Id. at *4, citing *Oregon v. Mathiason* (1977), 429 U.S. 492, 494, 97 S.Ct. 711, 50 L.Ed.2d 714.

35.  Id., quoting *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275.

36.  Id., quoting *State v. Staley* (May 8, 2000), 12th Dist. No. CA99–08–019, 2000 WL 554512, *7.

tion, not on the subjective views harbored by either the interrogating officers or the person being questioned.[37] "In determining whether a person is in custody, the relevant inquiry is, given the totality of the circumstances, whether a reasonable person in the individual's position would have believed that he was not free to leave."[38] "When reviewing the totality of the circumstances, courts should consider, the 'age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' "[39]

{¶ 47} In *State v. Walker* (Sept. 16, 1997), 10th Dist. No. 97APA02–212, 1997 WL 578946, the defendant agreed to allow officers to interview him in his home.[40] The court noted that since the interview was conducted in surroundings familiar to the defendant, the interview did not constitute coercive questioning of a person swept from familiar surroundings into police custody.[41] The court also noted that there was no evidence to support a finding that the defendant was not free to leave; instead, the evidence demonstrated that the defendant was not handcuffed or restrained and that the officer told the defendant that he was not in custody or under arrest.[42] Therefore, under the totality of the circumstances, a reasonable person in Walker's position would not have felt that he or she was not free to leave.[43]

{¶ 48} In *State v. Jordan*, 2d Dist. No. 2004CA115, 2005-Ohio-4202, 2005 WL 1939801, the defendant was questioned in the living room of his home. The court noted that this is a location where a person would normally feel free to leave.[44] Jordan was not handcuffed or told that he was under arrest, and the officers told him several times that he did not have to answer their questions and that he was

37. Id., quoting *Stansbury v. California* (1994), 511 U.S. 318, 323–324, 114 S.Ct. 1526, 128 L.Ed.2d 293.

38. *State v. Spence*, 12th Dist. No. CA2002–05–107, 2003-Ohio-4237, 2003 WL 21904788, ¶ 12, citing *Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317; and *State v. Gumm* (1995), 73 Ohio St.3d 413, 429, 653 N.E.2d 253, citing *United States v. Mendenhall* (1980), 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497.

39. *State v. Boyd*, 4th Dist. No. 02CA744, 2003-Ohio-983, 2003 WL 753877, ¶ 9, citing *State v. Slagle* (1992), 65 Ohio St.3d 597, 600, 605 N.E.2d 916.

40. *State v. Walker* (Sept. 16, 1997), 10th Dist. No. 97APA02–212, 1997 WL 578946, at *3.

41. Id., citing *Miranda v. Arizona* (1966), 384 U.S. 436, 461, 86 S.Ct. 1602, 16 L.Ed.2d 694.

42. Id.

43. Id. at *4.

44. *State v. Jordan*, 2d Dist. No. 2004CA115, 2005-Ohio-4202, 2005 WL 1939801, at ¶ 39.

free to leave at any time.[45]  Furthermore, there was no evidence of any coercive activity by the officers.[46]  As a result, the court found that the defendant had not been subjected to a custodial interrogation, because someone in his position would not have felt that his freedom was restrained to the extent associated with formal arrest.[47]

{¶ 49} In *State v. Durham* (June 22, 2001), 2d Dist. No. 18596, 2001 WL 699527, officers entered the defendant's home because it had been burglarized. When the defendant arrived at the home, he was permitted to walk through it to identify what items had been stolen.[48]  Prior to the defendant's arrival at his home, police had discovered a sawed-off shotgun in the back room and, as a result, they accompanied him while he went through the house.[49]  However, the defendant was later permitted to use the restroom and go outside unaccompanied by officers.[50]  Thereafter, while sitting in the living room, the officers asked the defendant about the shotgun.[51]  The officers did not tell the defendant that he was not free to leave or otherwise give the defendant any reason to believe that he was in custody.[52]  Therefore, the court concluded that this questioning was not a custodial interrogation.[53]

{¶ 50} The court in *State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, determined that there was no formal arrest or restraint on the defendant's freedom of movement associated with formal arrest because the defendant invited the officers into her home, the questioning by the officers took place in the defendant's home, the officers did not handcuff or restrain the defendant, and the defendant never made an attempt to end the interview.[54]

{¶ 51} " '[T]he mere presence of police officers does not render a suspect powerless, particularly when that suspect is within the familiar surround-

---

45. Id. at ¶ 40.

46. Id.

47. Id. at ¶ 42.

48. *State v. Durham* (June 22, 2001), 2d Dist. No. 18596, 2001 WL 699527, at *4.

49. Id.

50. Id.

51. Id.

52. Id.

53. Id.

54. *State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, at ¶ 24.

ings of her own home.' " [55] In general, questioning by law enforcement is less likely to rise to the level of a custodial interrogation when it occurs in a defendant's home.[56]

{¶ 52} Other jurisdictions have set forth several factors to consider when faced with the question whether a situation rises to the level of a custodial interrogation.

{¶ 53} Massachusetts courts use the following factors: "(1) the place of the interrogation; (2) whether a reasonable person in the position of the person being questioned would not feel free to leave the place of questioning; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and, (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave." [57]

{¶ 54} In *United States v. Bullins* (D.N.H.1995), 880 F.Supp. 76, the court noted that while a suspect may be lawfully detained in certain circumstances, such as while officers are executing a search warrant, such detention does not justify a custodial interrogation of the suspect without reading that suspect his *Miranda* warnings.[58] In the *Bullins* case, armed officers entered the defendant's home to execute a search warrant.[59] The defendant was directed to sit at the kitchen table where he was then questioned by one of the officers.[60] The defendant testified that he answered the officer's questions because he did not think he had the option to walk away and he did not want to be taken to Concord, approximately an hour away, for questioning.[61] The defendant was not handcuffed, nor was he formally placed under arrest; however, the defendant was not free to leave or move freely about his home while the search was being conducted.[62] The officer testified that had the defendant attempted to leave, he

---

55. *State v. Petriashvili*, 8th Dist. No. 92851, 2009-Ohio-6466, 2009 WL 4695459, ¶ 18, quoting *State v. Hopfer* (1996), 112 Ohio App.3d 521, 546, 679 N.E.2d 321.

56. Id. at ¶ 30 (Kilbane, P.J., dissenting).

57. *Commonwealth v. Brown* (2003), 57 Mass.App.Ct. 326, 331, 782 N.E.2d 1105, citing *Commonwealth v. Bryant* (1984), 390 Mass. 729, 737, 459 N.E.2d 792.

58. *United States v. Bullins* (D.N.H., 1995), 880 F.Supp. 76, at fn. 2.

59. Id. at 77.

60. Id.

61. Id.

62. Id.

would have been restrained or removed from the home and placed under guard.[63]

{¶ 55} The *Bullins* court examined "whether there was a manifestation of a significant deprivation of or restraint on the suspect's freedom of movement, taking into account such factors as 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'"[64] The court noted that "[t]his was not a situation in which law enforcement officers routinely enter a suspect's home for an informal discussion relevant to a general investigation, or one in which casual questions related to identity, personal safety, or access to the premises."[65] The court further stated that the defendant was not at liberty to leave or move freely around the house, he was required to remain seated at the kitchen table under the watch and control of agents, and the presence of armed officers created an atmosphere that was at least intimidating if not fully coercive, despite the fact that the questioning occurred in the defendant's own home.[66] The court concluded that under the totality of the circumstances, there was a manifestation of a significant deprivation of or restraint on the defendant's freedom of movement to the degree associated with formal arrest, and as a result, the interrogation was custodial.[67]

{¶ 56} The Sixth Circuit Court of Appeals has used the following factors when determining whether questioning was custodial: "(1) the purpose of the questioning; (2) whether the place of questioning was hostile or coercive; (3) the length of the questioning; (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions."[68]

{¶ 57} The Ninth Circuit Court of Appeals, in the case of *United States v. Craighead* (C.A.9, 2008), 539 F.3d 1073, explained that, while courts are generally less likely to find an interrogation in the suspect's home to be custodial, *Miranda*

---

63. Id.

64. Id. at 78, citing *United States v. Lanni* (C.A.1, 1991), 951 F.2d 440, 442.

65. Id. at 79.

66. Id. at 78–79.

67. Id. at 79.

68. *United States v. Salvo* (C.A.6, 1998), 133 F.3d 943, 950.

warnings are required if the person is deprived of their freedom in a significant way, which can be demonstrated by a "police-dominated atmosphere" in the home.[69] In *Craighead*, armed officers, some in "raid gear," entered the defendant's home.[70] Additionally, although the defendant was not handcuffed or physically restrained, he was taken to a storage room by an officer and the door was closed behind them.[71] The court noted that when a defendant is restrained from moving around his home, or if officers insist on escorting a defendant at all times, that suspect may feel he is subject to police domination within his own home and thus not free to leave or terminate the interrogation.[72] The court further stated:

> We understand that in many cases, when law enforcement agents conduct an in-home interrogation while conducting a lawful search of the home, physical control of the suspect will be necessary to preserve evidence and protect the safety of the agents. The fact that these precautions may be necessary to the success of the lawful search does not lessen their tendency to make a reasonable person believe he is in custody. We agree with the First Circuit that:
>
> > "If the government is correct that the agents' actions were necessary for evidence preservation and officer safety, then it could have chosen to postpone the interrogation until a non-custodial moment, or to Mirandize [the suspect]. Either step would have protected both the defendant's constitutional rights and the officers' legitimate law enforcement needs." [73]

The court also found that the defendant was isolated from others and that he had a reasonable objective belief that he was not free to leave.[74] Based on all of the facts of the case, the court determined that the defendant's interrogation was custodial and that *Miranda* warnings were required.[75]

{¶ 58} In the case at bar, the court first notes that Pryor "could not recall" any details of the questioning or whether the defendant's statement that the contraband in the home belonged to him was in response to a question. The court finds that this lack of memory on the part of the questioning officer is not sufficient for

---

69.  *Craighead*, 539 F.3d at 1083.

70.  Id. at 1085.

71.  Id. at 1086.

72.  Id. at 1085.

73.  Id. at 1086, quoting *United States v. Mittel–Carey* (C.A.1, 2007), 493 F.3d 36, 40.

74.  Id. at 1086–1088.

75.  Id. at 1089.

this court to find that the statement regarding the contraband was not made in response to questioning. The court finds it improbable that the defendant would have simply volunteered this information, based on all of the facts before it. Pryor testified to questioning the defendant, and the court finds that all the statements at issue regarding the contraband made while the defendant was in the home were made in response to direct questions likely to elicit an incriminating response.

{¶ 59} Therefore, the court must determine whether this questioning took place in a custodial setting. The fact that the interrogation occurred in the defendant's home weighs in favor of finding that the interrogation was noncustodial. Additionally, the length (approximately 30 minutes) and congenial nature of the questioning also weighs in favor of finding that the defendant was not in custody for the purposes of *Miranda*.

{¶ 60} However, armed officers entered the defendant's home, initially without his or anyone else's permission, as discussed above. The defendant was directed to remain seated in the kitchen throughout the entirety of the search with at least one other agent, if not several agents, remaining in the kitchen with him. From the moment that Pryor first entered the defendant's home, he told the defendant that he could not let him out of his sight.

{¶ 61} As a result, the defendant did not feel as if he had a choice in the matter of whether to remain in the home and, in fact, he did not, and he was told as much by Pryor. The defendant was not free to leave the house or even to move freely throughout the house on his own because Pryor made it clear to him that he had to be kept in his sight at all times. Pryor himself testified that he would not have let the defendant leave the residence had he requested to do so.

{¶ 62} In consideration of all of these circumstances, the court finds that on the date in question, the restraint on the defendant's freedom of movement was significant. Given the totality of the circumstances, a reasonable person in the defendant's position would not have believed that he was free to leave the residence. As a result, Pryor's questioning of the defendant regarding the contraband was a custodial interrogation and required that the defendant be read the *Miranda* warnings. The defendant was not read his *Miranda* rights, and, therefore, any and all statements elicited from the defendant in response to this questioning must be suppressed.

{¶ 63} The court notes that the initial statement by the defendant that the marijuana "grew wild" on the property is not subject to this suppression. At that point, the defendant was standing on the porch speaking with Pryor, and Pryor had not yet entered the home, and the defendant had not yet been told that Pryor would not let him out of his sight. There was nothing custodial about this

situation, and, therefore, there is no basis for suppression of that particular statement.

## III.  CONCLUSION

{¶ 64} The defendant's motion to suppress is well taken and is hereby granted as to any and all statements made during the custodial interrogation on the day in question.  The defendant's motion to suppress is not well taken and is hereby denied as to evidence collected from the house and the curtilage.

So ordered.