The STATE of Ohio, Appellee,

v.

YORK, Appellant.

[Cite as *State v. York* (1997), 122 Ohio App.3d 226.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

No. 96–L–182.

Decided Aug. 11, 1997.

*Jeffrey J. Church*, for appellee.

*Jeffrey H. Black*, for appellant.

NADER, Judge.

For whatever reason, defendant-appellant, Danita York, decided to shoot one of her horses on August 1, 1996.[1] She took a small caliber pistol and led the horse into a field visible to the rest of the neighborhood, where she attempted to kill the

---

1.  She said that the animal was suffering from colic and that a local veterinarian, one Joel W. Percival, D.V.M., advised her to put the horse down, but Dr. Percival denied having contact with appellant.

animal by shooting it in the head. Neighbors heard the gunshots, saw what appellant was doing, and called the Madison Township police.

Sergeant Leonard W. Delcalzo responded to the call, initially speaking to the complaining neighbor. He also heard gunshots coming from the York property and went to investigate. He found appellant in a nearby field covered with blood and complaining of premature labor pains (she was pregnant at this time with her third child). Sergeant Delcalzo called for an ambulance, then went to examine the horse. Appellant had fired five bullets into the animal's head, but it was still alive, breathing heavily and trying to get up. Sergeant Delcalzo shot the horse three times with his own handgun to end its suffering. Appellant was hospitalized.

The Yorks left the horse's carcass in the field overnight. Other neighbors called the Lake County Humane Society on the morning of August 2, 1996, to complain, but, before anyone could investigate, a private hauler arrived at about noon to remove the dead horse.

Nancy Talamantez, an officer with the Lake County Humane Society, drove to the York residence shortly before 2:00 p.m. to investigate the complaint regarding the dead horse. She parked her car in the driveway, approached the stoop, and knocked several times on the front door. No one answered. Since there were several cars in the driveway, Talamantez thought somebody was home and decided to try and find someone to talk to. She walked farther up the driveway toward a barn fifty feet from the main house. The barn and the house are served by the same driveway. A tattered blue tarpaulin hung limply on the left side of a large, irregularly shaped opening into the barn. Talamantez approached the opening, knocked on a side wall, and called out for appellant, but she did not enter the barn. She heard a moaning sound coming from her left, and, peering into the barn from her vantage point, saw a Shetland pony in a stall. She could see the tops of its hip bones, ribs, and vertebrae through its skin; the animal appeared to be emaciated, dehydrated, and starving.

Talamantez returned to her vehicle and radioed the Humane Society to call Dr. Joel Percival, a veterinarian. She then left the premises, driving to the Madison Township Police Department, seeking something called a "civil standby." There is no evidence in the record that she obtained a search warrant or any other order from a judge or magistrate. She spoke with Sergeant Delcalzo, who agreed to meet her at the York residence and assist her in investigating the condition of the Shetland pony, after answering a prior call.

Talamantez returned to the York residence. Dr. Percival was waiting in his car parked on the Yorks' driveway. Appellant's husband, Jeffrey York, was also there, complaining loudly about their presence on his property. Talamantez told the doctor what she had seen, and they moved their vehicles to the street to await

Sergeant Delcalzo. When the officer arrived, she explained the situation, and they reviewed the provisions of R.C. 1717.13, which they interpreted to give them authority to enter the barn and examine the animal. Mr. York was not inclined to allow them into the barn, but Sergeant Delcalzo explained to him that they thought they had statutory authority to do so. He relented.

Dr. Percival and Talamantez entered the barn and examined the pony. They confirmed that it was malnourished and found that it was suffering from some kind of infection. After deciding to impound the pony, Talamantez called for transportation, which arrived at about 4:00 p.m. Apparently, the pony was taken to a Lake County Humane Society shelter.

On August 22, 1996, Talamantez filed a criminal complaint in the Painesville Municipal Court against Danita York,[2] charging her with cruelty to animals under R.C. 959.13(A)(1), for neglecting the Shetland pony. On October 10, 1996, appellant filed a motion to suppress, which, although it does not state expressly, was apparently intended to challenge all the evidence regarding the animal's condition (certain photographs and the testimony of Talamantez and of Dr. Percival) as being the fruit of an illegal search and/or seizure. The trial court denied the motion. Appellant then changed her plea to no contest, and the court convicted her. She was sentenced to serve twenty days in the Lake County Jail,[3] fined $750, and placed on twenty-four months' probation. Appellant was also ordered to issue a formal apology to Nancy Talamantez and to perform ten days of community service by cleaning horse stalls at an upcoming county fair. The court ordered the Shetland pony forfeited to the Lake County Humane Society. The sentence was stayed pending the outcome of this appeal.

Appellant assigns three errors:

"1. The trial court erred to the prejudice of defendant–appellant in denying her motion to suppress.

"2. The Lake County Humane Society wrongfully seized defendant–appellant's pony.

"3. The trial court's sentence was cruel and unusual punishment."

■ In the first assignment of error, appellant argues that the actions of Nancy Talamantez in stepping up to the barn opening and looking inside violated

---

2. She also filed a complaint against Jeffrey York, but this case deals only with appellant's prosecution.

3. The sentence was ninety days, but ten of those would be served by community service, and another sixty were suspended on the condition that York abide by the terms of her probation. Thus, her net sentence was twenty days to be served in the county jail.

her Fourth Amendment rights. The first question we must answer, however, is whether the Fourth Amendment is even applicable in this situation.

■ The modern theory of search and seizure law is that the Fourth Amendment serves to protect the individual's subjective expectation of privacy that society is prepared to accept as "reasonable." *Rakas v. Illinois* (1978), 439 U.S. 128, 143–144, 99 S.Ct. 421, 430–431, 58 L.Ed.2d 387, 401–402; *Katz v. United States* (1967), 389 U.S. 347, 360–361, 88 S.Ct. 507, 516–517, 19 L.Ed.2d 576, 587–588 (Harlan, J., concurring). One implication of this theory is that law enforcement officers do not transgress any constitutionally protected interest when they intrude upon a place where an individual does not have a reasonable expectation of privacy. In those situations, it is said that no "search" has occurred within the meaning of the Fourth Amendment and evidence obtained thereafter need not be suppressed. *E.g., Illinois v. Andreas* (1983), 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003, 1010. The essential inquiry, then, is whether the actions of Talamantez constituted a "search," which, in turn, depends upon whether appellant had a reasonable expectation that the interior of her barn would remain private.

■ It has long been held that a person's house is his or her castle and that law enforcement officials may not enter a person's residence to search for evidence of a crime without a search warrant. *Weeks v. United States* (1914), 232 U.S. 383, 389–390, 34 S.Ct. 341, 343, 58 L.Ed. 652, 654–655. Fourth Amendment protections of the home generally extend to the outbuildings located upon the curtilage, such as barns, and it can be fairly said that property owners have legitimate expectations of privacy in them. *Oliver v. United States* (1984), 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214, 225.

■ We have little difficulty viewing this barn, situated only fifty feet from the main house, connected by a driveway, and being put to ordinary household uses, as being part of the Yorks' curtilage under the test set forth in *United States v. Dunn* (1987), 480 U.S. 294, 301, 107 S.Ct. 1134, 1139–1140, 94 L.Ed.2d 326, 334–335. But this does not end the inquiry. "That the area is within the curtilage does not itself bar all police observation." *California v. Ciraolo* (1986), 476 U.S. 207, 213, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210, 216. Property owners may lose their rights of privacy for activities conducted on the curtilage under certain circumstances, as where he or she does not take steps to shield the activity from view. See, *id.;* cf. *Katz,* 389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d at 582 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").

Two cases from California aptly demonstrate the principle. In *People v. Landry* (1969), 276 Cal.App.2d 370, 80 Cal.Rptr. 880, two deputies from the San

Diego County Sheriff's Department drove a marked cruiser down a private dirt road at 1:00 a.m. and noticed Landry sitting at a table in front of a lighted, undraped window of his house. The deputies paused to watch and clearly saw him rolling marijuana cigarettes. They arrested him when he later came out of the house. The court of appeals rejected Landry's claim that the officers violated his constitutional rights because he failed to draw the blinds. *Id.*, 276 Cal. App.2d at 374–375, 80 Cal. Rptr. at 883. Expressing the holding in terms of the *Katz* test, Landry did not exhibit a subjective expectation of privacy when he conducted his illegal activity right in front of a lighted window with the blinds drawn back as if he were on a stage, thereby exposing himself to the casual observation of passersby on the darkened street.

Contrast this case with *Pate v. Mun. Court for the Modesto Judicial Dist.* (1970), 11 Cal.App.3d 721, 89 Cal.Rptr. 893, where two sergeants with the Stanislaus County Sheriff's Department went to investigate a tip that lewd movies were scheduled to be shown in a certain motel room. When they arrived, they saw a flickering light emanating from behind the draperies of a second-floor room. One of the sergeants climbed an ornamental trellis and looked into the motel room through a small, one-inch opening at the center of the window sill where the drapes joined imperfectly together. He observed an obscene film. The court of appeals held that Pate exhibited a reasonable expectation of privacy by drawing the curtains on the window and that the officer intruded upon his privacy and violated Pate's Fourth Amendment rights when he peeked into the room through the tiny, accidental aperture. *Id.*, 11 Cal. App.3d at 724, 89 Cal. Rptr. at 895.

These holdings are readily applicable to buildings on the curtilage. A property owner who does not take care to conduct a particular activity or to conceal incriminating objects in unobservable recesses of an outbuilding, but chooses instead to conduct that activity or place that object in an area readily visible from an open doorway, has not manifested a subjective expectation that these shall remain private, and has, in a sense, waived his Fourth Amendment rights. See *Dunn, supra* (no "search" was conducted where officers trespassed onto a private ranch and saw drug manufacturing equipment through an open barn door); *State v. Osborn* (Cty.Ct.1980), 63 Ohio Misc. 17, 21, 16 O.O.3d 88, 90–91, 409 N.E.2d 1077, 1081 (anything humane officer sees from driveway of a farm was not subject to a reasonable expectation of privacy and was not suppressible).

When Talamantez arrived on the York property, the blue tarpaulin was not drawn across the entrance to the barn. If the Yorks wanted to keep the contents of the barn private, they could have covered the opening, thereby protecting the interior from observation by passersby on the driveway. Since the Yorks made no effort to keep the pony in a stall located in a less observable area of the barn,

and since they did not care to shield the stall from visual inspection, they have not manifested a subjective expectation that the condition of the pony and its stable would remain private. Merely looking at the pony from the driveway did not, therefore, amount to a "search."

Appellant misinterprets the basic constitutional law on this point, arguing in her appellate brief that looking at the pony cannot be justified under the plain view doctrine. The principles regarding whether there has been a search for an object found in the open, and whether a law enforcement officer may seize the object in plain view as evidence of a crime, are certainly related.[4] But the "plain view" doctrine applies only to seizures of incriminating evidence.

Some commentators have differentiated these ideas by suggesting that the law regarding the question whether viewing something left in the open is a "search" as understood by the Constitution ought to be referred to as the "open view" doctrine, whereas the law regarding the question whether an object in plain view may be seized without a warrant ought to be referred to as the "plain view" doctrine. See *State v. Stachler* (1977), 58 Haw. 412, 416–417, 570 P.2d 1323, 1327. See, also, *Minnesota v. Dickerson* (1993), 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334; *Arizona v. Hicks* (1987), 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347; *Texas v. Brown* (1983), 460 U.S. 730, 738, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502, 511, fn. 4 (plurality opinion).

In this case, Talamantez first looked into the barn, then conducted a medical examination of the horse with Dr. Percival, and then seized the animal. Of these three acts, appellant challenges only the first as being unconstitutional. Looking into an open barn is not by any stretch of the imagination a *seizure*, but it may constitute a *search* as that term is understood in Fourth Amendment jurisprudence, depending on whether the owner has a legitimate expectation of privacy therein. Hence, the "open view" doctrine is the applicable law, not the "plain view" doctrine.

---

4. As Justice White explained:

"The rationale of the plain view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point. See *Illinois v. Andreas,* 463 U.S. 765, 771 [103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003, 1010 (1983)]; *Texas v. Brown,* [460 U.S. 730] 740 [103 S.Ct. 1535, 1542, 75 L.Ed.2d 502, 512–513] * * * (1983). The warrantless seizure of contraband that presents itself in this manner is deemed justified by the realization that resort to a neutral magistrate under such circumstances would often be impracticable and would do little to promote the objectives of the Fourth Amendment." (Citations omitted.) *Minnesota v. Dickerson* (1993), 508 U.S. 366, 375, 113 S.Ct. 2130, 2137, 124 L.Ed.2d 334, 345–346.

That the humane officer merely looked into the barn was not sufficient to exclude the evidence regarding the abysmal condition of the pony, and the trial court did not err in overruling appellant's motion to suppress. The first assignment of error has no merit.

Nor does the second assignment of error. In it, appellant challenges the third act, the actual seizure of the pony, not on constitutional grounds, but as being contrary to the requirements of R.C. 1717.13. She apparently seeks a return of the pony instead of asserting this as a ground for suppressing evidence. Nor could she. Violations of statutory law do not implicate constitutional rights, and the exclusionary rule, which is intended to enforce constitutional rights, has no application in such a situation. *Kettering v. Hollen* (1980), 64 Ohio St.2d 232, 234, 18 O.O.3d 435, 437, 416 N.E.2d 598, 599–600. Inasmuch as we read the second assignment of error as requesting different relief than was requested below, the error, if any, must be deemed waived, since appellant did not raise the legality of the seizure in the trial court. *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, at the syllabus.

Even if we were to address the merits of appellant's argument, we would still overrule the second assignment of error because we disagree with appellant's interpretation of R.C. 1717.13 that humane society officers must observe an animal for fifteen hours before they can seize or impound it.

R.C. 1717.13 states:

"When, in order to protect any animal from neglect, it is necessary to take possession of it, any person may do so. When an animal is impounded or confined, and continues without necessary food, water, or proper attention for more than fifteen successive hours, any person may, as often as is necessary, enter any place in which the animal is impounded or confined and supply it with necessary food, water, and attention, so long as it remains there, or, if necessary, or convenient, he may remove such animal; and he shall not be liable to an action for such entry. In all cases the owner or custodian of such animal, if known to such person, immediately shall be notified by him of such action. If the owner or custodian is unknown to such person, and cannot with reasonable effort be ascertained by him, such animal shall be considered an estray and dealt with as such."

This section provides defenses to an action, in trespass or conversion, for instance, by the true owner of an animal against any person (a humanitarian) who takes it into possession. The first sentence provides a qualified immunity, which exempts a humanitarian's taking possession of an animal if, and only if, it can be shown at a post-seizure proceeding that the animal was, in fact, neglected at the time it was seized, and if the owner was promptly notified of the seizure. See *Zageris v. Whitehall* (1991), 72 Ohio App.3d 178, 594 N.E.2d 129. The first

sentence contemplates immediate action by the humanitarian. The second sentence provides an absolute defense against liability if (1) the animal is "impounded" or "confined," (2) the humanitarian observes the animal for a period of more than fifteen hours, and (3) the true owner is promptly notified after the humanitarian enters the property to feed, water, or care for the animal, or, in the alternative, to seize it.

Thus, the fifteen–hour "requirement" is only a condition the humanitarian must fulfill in order to be immune from liability for entering private land and confiscating private property. Such a period of observation is not required in all cases; the humanitarian may decide to take immediate action and assume the risk of liability if he or she fails to prove the condition of the animal at the post-seizure proceeding.[5]

The Yorks had confined the Shetland pony to the stall in the barn. Under these circumstances, Talamantez had the option, pursuant to the second sentence of R.C. 1717.13, to observe the pony for a period of fifteen hours in order to enjoy absolute immunity from civil liability should the Yorks bring suit for trespass or conversion. Instead, she decided to act immediately, relying on the qualified immunity of the first sentence and the assurance that she had ample evidence with which to prove the pony's condition at the time of the seizure. That she did not wait the full fifteen hours does not render the seizure "illegal" such that the pony must be returned to the Yorks.[6]

The second assignment of error is overruled.

We also reject the third assignment of error. In what we consider to be a chastisement of appellant, the trial judge remarked at her sentencing hearing:

---

**5.** R.C. 1717.13 does not explicitly refer to government officials. The text makes the defenses available to "any person," which certainly includes them, but an official who seizes animals to enforce public health or safety regulations may also rely on the sovereign immunity statute, R.C. 2744.03. *Zageris v. Whitehall* (Dec. 29, 1992), Franklin App. No. 92AP–388, unreported, 1992 WL 394870.

**6.** This is not to say, however, that the seizure was constitutional. Although appellant has inexplicably failed to challenge the medical examination and the seizure of the pony on constitutional grounds, we take this opportunity to advise Humane Society officers to carefully review their established procedures for entering private property and seizing neglected animals. We do not share Talamantez's understanding of R.C. 1717.13 as authorizing warrantless entries by government officials. The statute says only that "any person" may enter onto private property under certain conditions in order to remain free from civil liability. It does not prescribe the procedure by which government officials may legitimately enter and seize private property, which, in all cases, must comply with the minimum requirements of the Constitution. "The statute may well provide civil and/or criminal immunity to one acting pursuant to it * * *, but it cannot serve as a legislative abrogation of the warrant requirement of the Fourth Amendment." *Osborn*, 63 Ohio Misc. at 20, 16 O.O.3d at 90, 409 N.E.2d at 1080.

" * * * I'm going to sentence you to[ ] ninety days in Lake County jail, twenty of those days will begin next Friday at 7 p.m. I'm also going to order the sheriff of the jail—and I don't know if I can do this, but I'm going to order it until I'm told otherwise—that you be only given such food and sustenance in the jail that an OB/GYN doctor says is necessary for you to have. You are not going to have the daily jail menu. I want you to feel the hunger pains while you are in jail that you've let the animal feel."

The actual judgment entry, through which the court officially speaks, does not contain a requirement that appellant be made to go hungry:

"The Defendant is sentenced to spend a term of incarceration of ninety (90) days in the Lake County Jail. Twenty (20) days of the jail sentence shall start on November 8, 1996 at 7:00 p.m. During the period of her incarceration the Lake County Sheriff is hereby directed to provide only such food as is necessary for Defendant's health in providing nourishment for her fetus. A nutritional plan shall be approved by a license[d] physician specializing in the practice of obstetrics. The Defendant shall not be permitted to eat or drink any food or beverage not necessary for her health or the health of her fetus."

It is obvious by reading the text of the sentencing entry that the judge did not actually order that appellant be deprived of sustenance, whatever he may have said at the sentencing hearing. It states only that she must be placed on a diet that is approved by a licensed physician specializing in the practice of obstetrics and be given nothing unnecessary for her own health or that of her fetus. This order expressly requires a nutritionally adequate diet and prohibits only "extras," such as dessert or soda pop. Although the quoted language is unusual, it is not unconstitutional, as the Eighth Amendment to the Constitution requires only that states provide an inmate with "nutritionally adequate food." *Ramos v. Lamm* (C.A.10, 1980), 639 F.2d 559, 570–571, certiorari denied (1981), 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239; *Newman v. Alabama* (C.A.5, 1977), 559 F.2d 283, 291, reversed in part on other grounds *Alabama v. Pugh* (1978), 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 ("If the State furnishes its prisoners with reasonably adequate food, * * * that ends its obligations under Amendment Eight.").

In any event, we have been informed that appellant has given birth, so the sentencing entry calling for the intervention of an obstetrician is moot.

The judgment is affirmed.

*Judgement affirmed.*

FORD, P.J., concurs.

CHRISTLEY, J., concurs in judgment only.