[Cite as *State v. Powell*, 2017-Ohio-8669.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | C.A. CASE NO. 27580 |
| | : | |
| v. | : | T.C. NO. 2017-CRB-144W |
| | : | |
| HENRY POWELL | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 22nd day of November, 2017.

. . . . . . . . . . .

J. JEFFREY HOLLAND, Atty. Reg. No. 0040089, Holland and Muirden, 1343 Sharon-Copley Road, P.O. Box 345, Sharon Center, Ohio 44274
  Attorney for Plaintiff-Appellant

SCOTT A. ASHELMAN, Atty. Reg. No. 0074325, P.O. Box 752345, Dayton, Ohio 45475

and

DANIEL F. GETTY, Atty. Reg. No. 0074341, 46 E. Franklin Street, Centerville, Ohio 45459
  Attorneys for Defendant-Appellee

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the May 9, 2017 Notice of Appeal of the State of Ohio. The State appeals from the trial court's May 3, 2017 "Decision and Entry" sustaining Henry Powell's motion to suppress. We hereby reverse the judgment of the trial court and remand the matter for further proceedings consistent with this opinion.

{¶ 2} Powell was charged by way of complaint on February 3, 2017, in the Municipal Court of Montgomery County, Western Division with seven counts of cruelty to animals, in violation of R.C. 959.13(A)(1), misdemeanors of the second degree. Powell's brother, Amos Powell, was also charged with seven counts of cruelty to animals in Case No. 2017 CRB 00145W.

{¶ 3} On April 13, 2017, Powell filed his motion to suppress, and the State responded on the same day. A hearing was held on the motion on April 17, 2017, at which time the court also ruled upon Amos Powell's motion to suppress. At the hearing, Heather Concannon testified that she works for the Humane Society of Greater Dayton as a humane agent, having been so employed since September of 2015. She testified that there has been an ongoing investigation since 2015 of cruelty to animals at 6719 Dayton Liberty Road, property owned by the Powells. She stated that it has "been ongoing with horses and one pig, at that time, that I was aware of." Concannon testified that she "was constantly getting complaints, both from the public, next-door neighbors, the news, and, also, from the County Sheriff's Office regarding horses not being fed and a pig being stuck." She testified further that the "horses would get out because there was no hay or food. One horse in particular would get out; the rest would follow."

{¶ 4} Concannon testified that on January 3, 2017, "while on my regular duties," she "drove by and pulled into the semicircle that's on the property, checking to see if the

horses had hay." She stated that there were previously three horses on the property, and that on January 3, 2017, she observed only two of them. Concannon testified that she "heard what sounded to be an animal in distress. I was looking for the third horse from the driveway that runs up the side of the property * * *." According to Concannon, she "walked up the driveway looking for the horse, thinking that it was down on the property, * * * and that's when I started hearing the squeals of pigs, obviously, and I had not seen pigs there before." Concannon stated that in her experience, the sound of a farm animal in distress requires immediate attention. She testified that "there's nobody that lives on that property, so the fact that there is not food present or no one that lives on that property to see what's going on there, it definitely is a concern." She testified that it is life-threatening for a horse to be down if the horse is injured or sick.

{¶ 5} Concannon identified Exhibits 1, 2 and 3 as photographs taken by her of the property. She testified that the home thereon has no windows and the roof is "caved in." She stated that the area where the horses are fed is one third or one half of the way up the driveway from Dayton-Liberty Road. Concannon testified that Exhibit 3 depicted a "tract of a road," and when asked if it was on Powell's property, she responded, "I don't know if it's on the property, but it runs up the side of the property," and that it is the access she uses to the property. The following exchange occurred:

Q. Can you see where the pig enclosure is on this picture?

A. It's right there (indicating).

Q. * * * So it's - -

A. On the property.

Q. - - in the distance, little bit back - -

A. Correct.

* * *

Q. * * * So was the pig enclosure - - did you finally get up to see it?

A. Yes.

Q. When you got up to see it, did it appear to be within the curtilage of a - - of an active residence?

A. An active residence? No, it's just on the property.

Q. Did it appear to be in anybody's yard ever?

A. If somebody ever lived in that white house, it would have been, but - -

Q. Well, how many feet away is it?

* * *

A. Probably * * * a football field or more.

Q. So would you say it's more or less than a hundred yards away from the house?

A. More.

{¶ 6} Concannon identified as Exhibit 4 a photograph of "a liquid mud that all the pigs were standing in where the pigs were" on January 3, 2017. Concannon stated that the pigs could not get out of the mud, and that every time the pigs "moved, it rippled like an ocean." Concannon testified that she smelled "fecal and urine ammonia" coming from the pen, and that these substances are toxic for the pigs. Concannon testified that she "did an infrared temp" of the liquid in the pen and it was 46 degrees, and that the pigs were at risk of hypothermia.

{¶ 7} The following exchange occurred:

Q.  * * * So this view that you had of the pigs that we showed you on Plaintiff's Exhibit Number 4, was that an open view from the driveway?

A.  Yes, it was.

Q.  Was it concealed by any privacy fence?

A.  No, sir.

Q.  Was there any "No Trespassing" signs?

A.  No, sir.

Q.  Did you have to go through any locked gates to get there?

A.  No, sir.

Q.  Anybody who was walking up this lane could see it plainly?

A.  Yes.

{¶ 8} Concannon testified that after observing the pigs, she contacted the Montgomery County Sheriff's Office and that deputies arrived at the property. She stated that shortly thereafter, Henry and Amos Powell arrived, along with Henry Powell's son. She stated that she discussed with them the "condition of the pigs' pen and the fact that it needed to be remedied, along with their food and their water."  She stated that she "explained to them that the conditions that the pigs were in was not acceptable, that it was definitely a health hazard; they could not be kept that way."  Concannon stated that "[w]e agreed on a timetable for them to fix that.  Both Mr. Powells stated that they would work on it through the week, because they also had another job.  They agreed that it would be fixed in a timely manner and that they would get them food and water."  According to Concannon, the Powells advised her that they had gotten rid of the third

horse "because they deemed that horse to be the troublemaker."

{¶ 9} Concannon testified that she returned to the property on January 4, 2017 to check on the pigs and horses. She stated that the pigs were in the same condition, and that it "was getting colder outside." Specifically, she stated that it was 27 degrees and that the temperature dropped to 18 degrees that night. Concannon stated that she did not see the Powells that day.

{¶ 10} Concannon testified that she returned to the property on January 7, 2017 in the afternoon. At that time, she stated that "all of the pigs were cold. They still had inadequate food. Their water trough had not been replenished; it was absolutely frozen. And the piglets, their teeth were actually chattering and their ears were shaking." As someone trained in animal husbandry, Concannon testified that the pigs "were freezing. They were actively freezing to death." She stated that one of the pigs had a "medical condition" that was later determined to be a "scrotal hernia." According to Concannon, the pigs "were all definitely, definitely very close to - - especially the smaller ones - - losing their lives that night, absolutely." Concannon stated that she "immediately went back to my office and made arrangements to have them removed." She stated that at the time it was six degrees outside without accounting for the wind chill, and that her camera "actually froze."

{¶ 11} When asked if she was trained to identify life-threatening issues in animals, Concannon stated that she is "recognized as an investigator by * * * Mike DeWine's office. I had just helped rewrite the Humane agent training as well as the Officers Training Manual for OPOTA [1] that just went into effect for the new training standards."

---

[1] Ohio Peace Officer Training Academy

Concannon stated that she never placed the Powells under arrest or placed them in custody, and that she did not engage in custodial interrogation with them. She stated that she did not read the Powells their rights.

{¶ 12} On cross-examination by counsel for Amos, Concannon stated that she had not seen a pig on the property for the previous 18 months to two years. She stated that on January 3, 2017, she asked the Powells "if they were going to get food and water out. They said yes. I said I would be checking. They did not tell me not to come back on the property." Concannon stated she returned to the property on January 7, 2017, at 3:00 in the afternoon, and that the pigs were removed around "midnight, 12:30, 1:00-ish." The following exchange occurred:

Q. * * * And you didn't think to get a warrant? You're taking somebody's livestock. Do you know the value on that property?

A. Yes, sir.

Q. You're taking them without their consent?

A. Yes, sir.

Q. And you did it without getting a warrant?

A. Yes, sir.

Q. Even though you had four days where you're going over to this property saying you had concerns, and you didn't take the time to go get a warrant?

A. No, sir.

Q. Why not?

A. On Friday, the afternoon there was a storm that changed and

was coming in.   The temperature was very rapidly dropping.   These pigs were freezing to death, and that was the earliest I could get transport.   We could not get a vet out there. * * *

Q.   What's that got to do with you getting your time to go get the warrant?

A.   It was a matter of trying to get transport, trying to facilitate lodging. * * *

Q.   You didn't get a warrant at any time on any of this matter, did - - * * *

A.   I had made an agreement with Mr. - - both Mr. Powells for them to upgrade the pen, move the pigs out of the pen they were in into a dry pen, make housing, get the appropriate food and water sources.

During that week, again, I'm one officer for the entire county.   The temperatures were dropping.   I was out checking on other livestock and companion animals.

When I came back on Friday, knowing that the storm was coming in and nothing had been done, it became a matter of life and death for - - initially, it was ten pigs; three of them had been removed.   I came back to check on those seven pigs.   They were literally freezing to death.

We do not have the facilities where we are [able] to house livestock, especially pigs being as destructive as they are, so it was a matter of life and death for those pigs to try to get them housed somewhere else.   I can only get those pigs moved and housed with a group of people.

Courts close at four o'clock, and I don't have a prosecutor readily available to get a search warrant at the same time to get those pigs moved. So no, sir, I did not get a warrant.

Concannon stated that she has obtained warrants before and is familiar with the process.

{¶ 13} On cross examination by counsel for Henry, the following exchange occurred:

Q. You indicated, when Mr. Huelsman asked you, what - - that you made an agreement with the Powells regarding the resolution of this problem with the pen, right?

A. Yes, sir.

Q. * * * Let's talk about that for a second. When did you make that agreement?

A. That was on the 3rd when they showed up, the first day I was there when I discovered that they actually had pigs. * * *

Q. And how long did you give them to get the pen squared away?

A. They were supposed to have it done by that Saturday, the 8th.

Q. * * * Would it surprise you to learn that Saturday was the 7th?

A. No.

Q. So * * * can we agree that that Saturday, January 2017 was the 7th of January?

A. I'll agree.

Q. * * * Fair enough.

So you gave them until Saturday to get it squared away. When did

you seize the animals?

A.  Actually, I know that it was the 7th because it was after midnight, so that would have been Saturday the 7th then.

Q.  Saturday the 7th?

A.  Yes, sir.

Q.  So - - so was the agreement that it would be - - everything would be fixed by midnight on Saturday, or by close of business on Saturday?

A.  I believe we had agreed that it would be - - I believe it was four o'clock on Saturday.

Q.  So you seized them ahead of time?

A.  That was before the storm change came through.

Q.  So that would have been a good answer if I had asked you if it was before the storm came through.

Did you seize them ahead of time, was my question.

A.  I did.

Q.  Thank you.

Did you have the Powells' number at the time that you seized those animals?

A.  Yes, I did.

Q.  Did you call them to advise them that you were going out there to seize those animals?

A.  Not on Friday, I did not.

* * *

Q. That you were reneging on the deal, that you were breaching the agreement that you had not to seize the animals until four o'clock on Saturday.

A. No.

{¶ 14} In sustaining the motions to suppress, the trial court indicated as follows:

All evidence marked and presented is deemed admitted.

After considering the testimonies of the witnesses and the evidence admitted for the purposes of said hearing, the Court does hereby find the Motion to Suppress well taken.

The use of any and all evidence observed and recovered from 6719 Dayton Liberty Road is hereby suppressed. Any and all statements made by the defendant and any subsequent evidence procured is hereby suppressed.

{¶ 15} The State asserts one assignment of error as follows:

THE TRIAL COURT ERRED BY GRANTING DEFENDANT'S MOTION TO SUPPRESS.

{¶ 16} According to the State, "[g]enerally, a person has an expectation of privacy in one's home and the surrounding curtilage. A person does *not* have an expectation of privacy in open fields which are not part of the curtilage of a residence." The State argues that the pig pen was not within the Powells' residence or its curtilage, and "therefore [the Powells] had no reasonable expectation of privacy in the pig enclosure located adjacent to the driveway." The State argues that even "if an area is within the curtilage of a home, there is no expectation of privacy in observations made in open view

from a driveway." The State argues that "there was no evidence that the [Powells were] the owner[s] of or had any interest in the driveway where the observations were made. * * * [T]he driveway ran alongside the property where the pig pen was located, but the Officer was not able to tell if the driveway was part of that property. No other evidence was admitted."

{¶ 17} The State further argues that even if "*arguendo*, there were a constitutionally protected Fourth Amendment interest in the outdoor pig pen, the humane agent's observations fall under the **open view exception** to the warrant requirement." According to the State, open view "applies where an officer views an object that is **not** subject to a reasonable expectation of privacy. No search occurs when the owner of an object has voluntarily exposed it to public view." The State argues that "all relevant observations of the pigs and their enclosure were in open view from the access driveway, on a non-residential farm field, and were thus valid and constitutionally sound."

{¶ 18} According to the State, "the observations of the Officer and subsequent seizure were also permitted by exigent circumstances." The State argues that the "doctrine of exigent circumstances applies to removing animals which are in jeopardy from neglect." The State argues that Concannon "approached the pig enclosure in response to a cry of an animal in distress. * * * She initially gave [the Powells] a warning and a few days to make corrections, but a storm front moved in, dropping temperatures over 40° into the single digits." The State asserts that it "is unreasonable to suggest that an officer may not respond in an open farm field to the cries of an animal in distress, or to remove neglected animals from conditions which could reasonably be fatal."

{¶ 19} Finally, the State argues that the Powells "arrived at the property of [their]

own volition, spoke to the Officer voluntarily, and [were] permitted to leave without restraint of any kind. There was no evidence indicating that [the Powells] were coerced or that [their] statements were involuntary in any way."

{¶ 20} Henry Powell responds that he had "a legitimate expectation of privacy in regards to the pig pen because such was within the curtilage area of the Powell farm. Moreover, the pen was hidden from the public by a fence, a road, trees, and shrubbery." Henry asserts that "there is no indication as to whether Mr. Powell resided on the property, temporarily or permanently * * *." He argues that "[s]imply because Officer Concannon testified that one particular building on the property looked abandoned does not equate to Mr. Powell lacking a legitimate expectation of privacy in areas of the farm that even Officer Concannon described as being in the curtilage area." Henry argues that Concannon had the property "under constant surveillance," and that her "intrusion was continuous and ongoing and, therefore, rose to the level of a search within the meaning of the Fourth Amendment." He asserts that Concannon failed to investigate "the privacy rights of those who may have been present on the farm or had commercial interests thereon." According to Henry, Concannon's "observations while on the driveway were properly considered to be an unconstitutional search of the Powell farm due to the severe nature of her intrusions."

{¶ 21} Henry argues that there were no exigent circumstances. He argues that the "only testimony was that Officer Co[n]cannon heard a pig squeal. She then observed pigs on the farm. She then left the pigs on the Powell farm for at least four additional days. Obviously, under these facts, Officer Concannon could not have reasonably believed that exigent circumstances existed to enter the Powell farm." Finally, he argues

that "any statements made by Mr. Powell are fruit of the poisonous tree. Officer Co[n]cannon would have never obtained such statements, but for her illegal search of the Powell farm."

{¶ 22} As this Court has previously noted:

"Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Koon,* 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13 quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.* The application of the law to the trial court's findings of fact is subject to a de novo standard of review. *State v. Gordon*, 5th Dist. Fairfield No. 14–CA–13, 2014-Ohio-5027, ¶ 14, citing *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

*State v. Turner*, 2015-Ohio-4612, 48 N.E.3d 981, ¶ 10 (2d Dist.).

{¶ 23} "It is fundamental that searches conducted outside the judicial process, without a warrant, are per se unreasonable, subject to a few specifically established and well-delineated exceptions. *Katz v. United States,* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576. The burden is on those seeking an exemption from the constitutional

process to show the need for it." *State v. Peterson*, 173 Ohio App.3d 575, 2007-Ohio-5667, 879 N.E.2d 806, ¶ 11.

**{¶ 24}** As this Court further noted in *Peterson*, ¶ 12-17:

Analysis of Fourth Amendment law is primarily focused on whether a person has a "constitutionally protected reasonable expectation of privacy." *Katz,* 389 U.S. at 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (Harlan, J., concurring). "[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " *Id.* at 361, 88 S.Ct. 507, 19 L.Ed.2d 576.

"[O]bservations of things in plain sight made from a place where a police officer has a right to be do not amount to a search in the constitutional sense. On the other hand, when observations are made from a position to which the officer has not been expressly or implicitly invited, the intrusion is unlawful * * *." *Lorenzana v. Superior Court* (1973), 9 Cal.3d 626, 634, 108 Cal.Rptr. 585, 511 P.2d 33.

In *Oliver v. United States* (1984), 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214, the United States Supreme Court held that police did not violate the defendant's Fourth Amendment rights when they trespassed onto the defendant's farm field several hundred feet from the defendant's farmhouse. Justice White noted that a person may not legitimately demand privacy for activities conducted out of doors, except in the area immediately surrounding the home. *Id.* at 178, 104 S.Ct. 1735, 80 L.Ed.2d

214. He noted that open fields do not provide the setting for those intimate activities that the amendment is intended to shelter from government interference or surveillance. *Id.* at 179, 104 S.Ct. 1735, 80 L.Ed.2d 214. The court noted that only the curtilage warrants the Fourth Amendment protections that attach to the home. *Id.* at 180, 104 S.Ct. 1735, 80 L.Ed.2d 214.

Even if property is within the curtilage, a visual inspection of that property from outside the curtilage does not constitute a search. *United States v. Hatfield* (C.A.10, 2003), 333 F.3d 1189. In *Hatfield,* police officers' observations of a back yard while standing on a paved parking pad next to a house, during which an officer formed an opinion that marijuana plants might be growing in [the] yard, did not constitute a search under the Fourth Amendment because the driveway was open to the public. Circuit Judge Ebel noted in the opinion: "Furthermore, the Court said that, 'the fact that the objects observed by the officers lay within an area that we have assumed * * * was protected by the Fourth Amendment does not affect our conclusion.' The court emphasized that 'the officers never entered the barn, nor did they enter any other structure on respondent's premises.' Instead, '[o]nce at their vantage point, they merely stood, outside the curtilage of the house and in the open fields upon which the barn was constructed, and peered into the barn's open front.' Thus, 'standing as they were in the open fields, the Constitution did not forbid them to observe the [drug] laboratory located in respondent's barn.' " (Citations omitted.) *Id.*

at 1197, quoting *United States v. Dunn* (1987), 480 U.S. 294, 304, 107 S.Ct. 1134, 94 L.Ed.2d 326.   The court further observed at pages 1197 and 1198 of the opinion:

"Similarly, *Fullbright* [*v. United States* (C.A.10, 1968), 392 F.2d 432] involved law enforcement officers who, while trespassing on the defendant's open fields, observed from a distance the interior of an open shed located in the property's curtilage.   392 F.2d at 433-34.   We held the officers' observation of an illegal distilling operation in the shed was not a search prohibited by the Fourth Amendment.   *Id.* at 434.   We explained, however, that '[i]f the investigators had physically breached the curtilage there would be little doubt that any observations made therein would have been proscribed.   But observations from outside the curtilage of activities within are not generally interdicted by the Constitution.'   *Id.; see also* 1 LaFave, [Search and Seizure (1996) 515, Section 2.3(g) ] supra, § 2.3(g), at 515 (reasoning that police observation of incriminating objects or activity 'is unobjectionable -- even if what is seen is itself within the protected area called the "curtilage" -- if the police vantage point was itself in the "open fields" ')."

The curtilage is an area around a person's home upon which he or she may reasonably expect the sanctity and privacy of the home.   *Oliver,* 466 U.S. at 180, 104 S.Ct. 1735, 80 L.Ed.2d 214.   Because the curtilage of a property is considered to be part of a person's home, the right of the police to come into the curtilage is highly circumscribed.   *State v.*

*Woljevach,* 160 Ohio App.3d 757, 2005-Ohio-2085, 828 N.E.2d 1015, at ¶ 29. Absent a warrant, police have no greater rights on another's property than any other visitor has. *Id.* The only areas of the curtilage where the officers may go are those impliedly open to the public. *Id.*

**{¶ 25}** As this Court further noted in *State v. Little*, 183 Ohio App.3d 680, 2009-Ohio-4403, 918 N.E.2d 230, ¶ 18 (2d Dist.):

> * * * "At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.' " *Oliver v. United States* (1984), 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214, quoting *Boyd v. United States* (1886), 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746. The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened. *State v. Jones,* Lucas App. Nos. L-00-1231, L-00-1232, and L-00-1233, 2003-Ohio-219. In some instances, however, the curtilage of an area of a residence may not be protected when that area is open to public view. *State v. Staton* (Mar. 15, 1991), Greene App. No. 90-CA-62, 1991 WL 35224.

**{¶ 26}** In *State v. Martin*, 5th Dist. Stark No. 2006CA00339, 2007-Ohio-4821, Candy Martin was charged with two counts of cruelty to animals, and she filed a motion to suppress. The facts were as follows, ¶ 1:

> On August 24, 2006, Magnolia Police Officer Nicholas Kline received a complaint about possible neglect involving dogs located in a barn in

Waynesburg, Ohio. Officer Kline went to the barn to investigate, and entered the barn through an unlocked door. Based upon his observations on the condition of the dogs, Officer Kline called the Humane Society. On same date, Humane Society Officer Ron Sheaks went to the barn and posted a notice for someone to contact the Humane Society within twenty-four hours. The next morning, Officer Neil Denzer from the Stark County Dog Warden's Department went to the barn. He was joined by Officer Sheaks. Based upon their observations, they contacted the Magnolia Police Department for assistance. Sergeant Barbara Gardener arrived, as did the Assistant Director of the Humane Society, Jackie Godbey. The officers entered the barn through the unlocked door and removed the dogs, forty-two in all.

**{¶ 27}** The trial court determined that "there was a limited expectation of privacy in an unlocked barn five hundred feet from the home, and the decision to enter the barn was reasonable given the conditions, thereby giving rise to exigent circumstances." *Id.*, ¶ 18. The trial court "further found under the plain view/plain smell exception to a warrant that the search was reasonable." *Id.* In affirming the judgment of the trial court on the motion to suppress, the Fifth District conducted the following analysis at ¶ 20-31:

> The first inquiry is whether the barn was within the curtilage of the home. In *State v. York* (1997), 122 Ohio App.3d 226, 231, our brethren from the Eleventh District discussed the concept of curtilage as follows:
>
> "It has long been held that a person's house is his or her castle and that law enforcement officials may not enter a person's residence to search

for evidence of a crime without a search warrant. *Weeks v. United States* (1914), 232 U.S. 383, 389-390, 34 S.Ct. 341, 343, 58 L.Ed. 652, 654-655. Fourth Amendment protections of the home generally extend to the outbuildings located upon the curtilage, such as barns, and it can be fairly said that property owners have legitimate expectations of privacy in them. *Oliver v. United States* (1984), 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214, 225."

The specific facts in the case sub judice establish the owner of the home was not the lessee of the barn. Therefore, the curtilage rule is inapplicable. It was not established in the record which of the three co-defendants had leased the barn, but it was established the property owner had moved out of state. October 30, 2006 T. at 9-10. The renter of the smaller house on the property did not have any ownership interest in the property or the barn. *Id.* at 11. We further conclude the expectation of privacy that arises under the curtilage doctrine does not apply in this case even under the following four factors set forth by Justice White in *U.S. v. Dunn* (1987), 480 U.S. 294, 301:

"Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and

the steps taken by the resident to protect the area from observation by people passing by."

The barn sub judice was five hundred feet from the home, the barn was not within an enclosure surrounding either the larger or the smaller home, the barn was used to house some forty dogs, and although padlocked in front, the barn was visible from the road and was unlocked via the sliding door.

Even if other tribunals may find the barn, because it was leased by separate parties, had some expectation of privacy, we further find that under the plain view/plain smell exception and exigent circumstances doctrine, the search was reasonable.

The *York* court addressed a fact scenario strikingly similar to the facts in this case. In *York,* a Humane Society officer looked into a barn after receiving complaints about a dead horse and after hearing moaning sounds from the barn. The officer observed an emaciated, dehydrated and starving pony. The court concluded looking into the barn was not surveillance, and any subsequent search was justified under the "open view" doctrine.

In this case, the officers heard the barking of numerous dogs which was the genesis of the complaints. Standing alone, barking is not cause for a search because "all dogs bark." However, the ammonia smell caused by excessive urine was readily apparent upon approaching the barn. The smell was described as "overwhelming." October 30, 2006 T. at 14. Dog Warden Officer Denzer observed through a window seventeen animals confined in

cages or carriers stacked three high. *Id.* at 40. The temperature outside was eighty degrees with high humidity. *Id.* at 16, 41. It was with these readily open and observable facts that the officers entered the barn.

We conclude all of these collective factors led to a justified search under either the open view exception or the exigent circumstances doctrine. Further, the evidence in this case would clearly have been discovered if a warrant had been obtained; therefore, the inevitable discovery rule is applicable:

"If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means* * * then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense." *Nix v. Williams* (1984), 467 U.S. 431, 444.

The facts alone would have justified the issuance of a search warrant: there were numerous complaints of barking dogs that were verified on two separate days, a twenty-four hour notice was posted with no response, there was a noxious odor coming from the barn, and there was verification of numerous dogs stacked in cages.

Upon review, we find the trial court did not err in denying appellant's motion to suppress.

**{¶ 28}** We initially conclude, reading Concannon's direct and cross examination testimony together, that she first observed the pigs on January 3, 2017, a Tuesday, at which time she reached an agreement with the Powells to remediate the conditions of the

pen by the upcoming Saturday, January 7, 2017. Concannon returned to the property on January 4, 2017, and found that no action had yet been taken by the Powells. While she testified on direct that she next returned to the property on January 7, 2017, based upon her testimony on cross-examination, she appears to have initially believed that the eighth of January was a Saturday, when in fact January 7, 2017 was a Saturday. It appears that Concannon returned to the property on Friday, January 6, 2017, in the afternoon and then had the pigs removed early in the morning on January 7, 2017.

{¶ 29} As noted above, the curtilage is considered part of a person's home, and only the curtilage is entitled to the Fourth Amendment protections that attach to one's home. Concannon testified that the only "home" on the property was uninhabitable due to a fallen in roof and lack of windows. Concannon was clearly familiar with the property, having been there multiple times, and she testified that "there's nobody that lives on that property." The pig pen is one hundred yards from the vacant home, according to Concannon, and it does not appear to be within an enclosure surrounding the vacant home. There is a fence that runs along the side of the unpaved lane, but that fence does not appear to enclose the pen. Concannon testified that she does not know who owns the lane. The pen was used to house pigs, and there was no evidence of steps taken to protect the area from observation from the adjacent lane, such as a privacy fence, locked gates or "No Trespassing" signs. In other words, Powell did not exhibit an expectation of privacy in the pen; Concannon testified that anyone walking up the lane along the side of the property from Dayton-Liberty Road could plainly see the pig pen. Concannon did not enter the pen. We agree with the State that the pig pen was not within Powell's residence or its curtilage, and that Concannon's observation of the pigs was not a search for

purposes of the Fourth Amendment.

{¶ 30} Concannon testified that she responded to the area based upon only seeing two of the three horses she believed to be there and following the sound of an animal in distress, a sound she recognized in her experience as a humane agent. Concannon stated that when she first observed the pigs on January 3, 2017, they were standing in "liquid mud," and that she smelled "fecal and urine ammonia" coming from the pen, which is toxic to pigs. She further stated that the pigs were at risk of hypothermia due to the cold weather. On that date, the Powells arrived voluntarily and spoke to Concannon. She testified that she did not interrogate them, and we have no basis to conclude that their statements were subject to suppression. Concannon testified that when she returned to the property on January 4, 2017, the pigs were in the same condition, and the weather was getting colder. Finally, on her third trip to the property, Concannon stated that the pigs lacked food and fresh water, and that they were "actively freezing to death." One of them had a scrotal hernia. The outside temperature had fallen to six degrees, according to Concannon. We do not read her testimony regarding the agreement she reached with the Powells to in any way prohibit the removal of the pigs, as suggested by counsel for Henry on cross examination; the Powells were on notice that the pigs were in danger and that Concannon was continuously monitoring the situation, and as the condition of the pen remained unchanged, temperatures plummeted and created what Concannon termed a life or death situation for the pigs, who "were literally freezing to death." As in *Martin,* we conclude that based upon all of these facts, Concannon's observation and removal of the pigs was justified under the open view exception and the exigent circumstances doctrine. Accordingly, the State's assignment

of error is sustained, the judgment of the trial court is reversed, and the matter is remanded for further proceedings consistent with this opinion.

. . . . . . . . . . .

HALL, P.J. and FROELICH, J., concur

Copies mailed to:

J. Jeffrey Holland
Scott A. Ashelman
Daniel F. Getty
Hon. Adele M. Riley